**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2895-22

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

JAMIL S. HUBBARD,

 Defendant-Appellant.

_____

Argued November 6, 2025 – Decided May 7, 2026

Before Judges Marczyk, Bishop-Thompson, and Puglisi.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 19-03-0322.

Cody T. Mason, Deputy Public Defender II, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Cody T. Mason, of counsel and on the briefs).

Monica do Outeiro, Assistant Prosecutor, argued the cause for respondent (Raymond S. Santiago, Monmouth County Prosecutor, attorney; Monica do Outeiro, of counsel and on the brief).

PER CURIAM

Defendant Jamil S. Hubbard appeals from his jury trial conviction for first-degree murder, first-degree bias intimidation, second-degree eluding, third-degree possession of a weapon for an unlawful purpose, and third-degree theft of movable property. The jury rejected defendant's insanity defense. He further appeals from the sentence imposed by the trial court. Following our review of the record and the applicable legal principles, we affirm defendant's conviction but vacate his sentence and remand for sentencing.

I.

On March 11, 2019, a Monmouth County grand jury returned an indictment against defendant, charging him with: first-degree murder, N.J.S.A. 2C:11-3(a)(1) and/or N.J.S.A. 2C:11-3(a)(2) (count one); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3) (count two); first-degree armed robbery, N.J.S.A. 2C:15-1 (count three); first-degree bias intimidation, N.J.S.A. 2C:16-1(a)(1) and/or N.J.S.A. 2C:16-1(a)(2) (count four); second-degree eluding, N.J.S.A. 2C:29-2(b) (count five); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count six); and third-degree theft of movable property, N.J.S.A. 2C:20-3(a) (count seven).

2

On November 9, 2020, defendant moved to suppress the statement he made to police at his home shortly before his arrest and the recorded statement he made in custody after executing a written and oral waiver of his Miranda[1] rights. The court subsequently conducted a suppression hearing and denied the motion in an oral decision and accompanying order.

Defendant's twenty-one-day trial began in September 2022 and concluded on November 18, 2022. We derive the following facts from the record.

A.    The Assault and the Victim's Death.

On May 1, 2018, around 6:40 a.m., defendant called his girlfriend, K.W.,[2] from the parking lot of her apartment complex on Harding Road in Freehold (Harding Road complex). Defendant was locked out of his house, so he had slept in his vehicle the night before. K.W. did not answer the call but texted defendant at 6:50 a.m., telling him she was "trying to sleep" and he could not "come over." He asked her to bring his house keys to him. She declined, texting him he could not "pop up like th[at]" and she had "tried to give [him his] key" the night before. He asked her again for his keys. K.W. testified defendant's

---

[1]  Miranda v. Arizona, 384 U.S. 436 (1996).

[2]  We use initials to protect the confidentiality of the witnesses.

A-2895-22

text messages made her feel "uncomfortable" and she "knew [she] wasn't going outside."

After K.W. did not respond to defendant's last request, he backed his grey Chevy Malibu into K.W.'s vehicle. A Harding Road complex resident, P.M., testified that between 7:00 and 7:15 a.m., she observed a vehicle matching the description of defendant's vehicle repeatedly hitting another vehicle and "driving forward and backwards . . . into [its] driver's side door."

Meanwhile, the victim—an individual unknown to defendant—was returning home from work to the Harding Road complex. Defendant approached the victim and started to attack him. Harding Road complex residents witnessed the assault.

The victim's neighbor, N.A., testified he awoke at 7:15 a.m. to noises outside his bedroom window that sounded "like punches and kicks." Through his window, which faced the parking lot, N.A. witnessed defendant "bad[ly]" beating the victim, who was not defending himself. He recalled defendant cursing at the victim, saying words "like, mother f[***]ker." N.A. described the assault as taking place on "a grass area" between the parking lot and his condominium building. He recounted calling the police and watching defendant go to his vehicle, then return to the victim and resume kicking him in the head.

A-2895-22

N.A. explained defendant subsequently dragged the victim by his shirt towards the middle of the parking lot. N.A. later observed defendant "smiling" and "kind of dancing" near a dumpster, "burning some paper." In fact, defendant had searched the victim's pockets and taken his car keys and wallet. Defendant set cash from the victim's wallet on fire, entered the victim's Blue Kia, and drove away.

A.M.M., another resident of the complex, also witnessed the assault as she exited her home with her children. She testified the victim was not fighting back against defendant. A.M.M. recalled placing the children in her minivan because she "just wanted to get in the car and leave." She then observed defendant drag the victim by his arms into the middle of the parking lot, causing his shirt to be pulled off in the process. The witness described the victim's body as "limp" and noted the victim offered no resistance. She watched defendant get into his vehicle and drive over the victim's body. After calling 9-1-1, A.M.M. last saw defendant walking toward the dumpsters.

Emergency services arrived in response to the 9-1-1 calls, and responders found the victim shirtless with "tire tracks across his abdomen." Justin Hopler, a responding paramedic, testified the victim had "trouble breathing" and "suffered a major traumatic injury." Brett Smith, another paramedic, testified

A-2895-22

the victim, "please help me, please don't let me die."  As the victim was transported to Jersey Shore University Medical Center (JSUMC), he went into cardiac arrest just before reaching the hospital.

Dr. Abimbola Pratt, the trauma surgeon who treated the victim upon his arrival, testified the victim presented with the following injuries:

> Starting from his head, he had abrasions over . . . his head.  He had subcutaneous emphysema, which is air underneath the skin, that goes all the way up to his head and neck.
>
> He had an obvious chest wall deformity, which is concerning for [a] blunt traumatic chest injury. Abrasions over his abdomen, his flanks, . . . both knees[, and] . . . his left arm . . . had a deformity.

The victim also had multiple rib fractures, acute respiratory distress syndrome, traumatic subarachnoid hemorrhage, hemorrhagic shock, collapsed lungs, a grade one pancreatic injury, bilateral knee instability, and additional humeral, scapular, pelvic, and sacral fractures.  The victim "was in a persistent vegetative state" while hospitalized.  He also developed additional medical complications from his injuries, including hydrocephalus and sacral decubitus ulcers on his back.

Dr. Smitha Narasimhaswamy, the medical director at Specialty Hospital of Central New Jersey (Specialty Hospital) in Lakewood, testified the victim

A-2895-22

was transferred to Specialty Hospital on September 10, 2018.  At that time, his "prognosis was extremely poor."  Dr. Narasimhaswamy explained the victim "was on a ventilator, which was supporting his breathing [one] hundred percent," and he was believed to be suffering from "pain and anxiety."

The victim died at Specialty Hospital on October 18, 2018.  The medical examiner who conducted the victim's autopsy, Dr. Melissa Guzzetta, concluded the cause of his death was "blunt impact injuries of the head, torso[,] and extremities," and the manner of his death was homicide.

B.    The Chase After the Assault.

Freehold Township Police Officer Walter Magiera testified that on May 1, 2018, he responded to Harding Road, where he observed defendant driving the victim's blue Kia from the area in which the assault had occurred.  He tried to stop the vehicle "to see if [defendant] was involved with the incident."  At that point, however, defendant "pretty much . . . took off," ignoring the patrol vehicle's lights and sirens.  Freehold Township Police Officer Charles Lasky joined the chase when he observed Officer Magiera following the blue Kia. Defendant drove the Kia out of Freehold and into Old Bridge, towards New Brunswick.  Defendant was driving "recklessly," to the point the pursuit became too dangerous to continue and was called off "for [the] safety of the public."

7

East Brunswick Police Officer James Angermeier, Jr., resumed the chase after seeing a vehicle matching the dispatch description of the blue Kia defendant was operating. He initially followed defendant without activating his patrol vehicle's lights or sirens but activated both once defendant began travelling "southbound in the northbound lanes of Route 18" and "cut[ting] across the intersection." When the pursuit reached dangerous speeds over eighty miles per hour, Officer Angermeier terminated the pursuit, just as defendant drove into Sayreville. There, Sayreville Police Sergeant Joseph Bartlinski heard a radio transmission reporting an "erratic" driver on Bordentown Avenue, near where Officer Angermeier had last seen the Kia. Sergeant Bartlinski drove down Bordentown Avenue to an area near the Winding Wood apartment complex, where he found the Kia abandoned but still running in the roadway, within walking distance of one of the complex's entrances.

C.     Defendant's Arrest and Confession.

Around 7:45 a.m. on the day of the incident, Sayreville Police Officer Glenn Wagner responded to a dispatch seeking a "blue or grey Kia that was possibly involved in an aggravated assault in Freehold" near the Winding Wood apartment complex. As he turned into the complex, he was "flagged . . . down" by K.H., defendant's mother, who was "standing outside of her car, jumping up

and down, [and] frantically yelling." K.H. informed Officer Wagner defendant "ran into [her] house with no shirt on, profusely sweating," yelling at her to "[g]et off the f[***]ing phone." She also told Officer Wagner, "he tends to get violent and . . . [i]s bipolar." Four additional Sayreville police officers arrived at the scene.

Officer Wagner approached defendant's home with the other officers and knocked on the door. Defendant answered and identified himself. Officer Wagner asked him to step outside and have a seat on the porch steps. When asked about his involvement with a motor vehicle accident in Freehold, defendant answered "he drives a pickup truck, didn't know the make or model, . . . didn't know if he was involved in an accident, and . . . did not know where he parked his . . . pickup truck." Officer Wagner described defendant as calm, cooperative, and responsive.

Shortly thereafter, Officer Wagner, responding to a communication request from the Freehold Police Department to detain defendant, handcuffed defendant and sat him in the back of a Sayreville patrol car. Officer Wagner testified the officers "had no . . . idea of what was going on" at that point.

Officer Wagner transported defendant to the Sayreville police station, during which time defendant was "rapping, yelling," "kicking [and] spitting on

9

the partition," spitting in Officer Wagner's direction, and saying "f[***] the police." After arriving at the station, defendant was placed in the custody of the Freehold police and taken to the Monmouth County Prosecutor's Office.

Detective Wayne Raynor of the Monmouth County Prosecutor's Office conducted the investigation as the lead detective. Defendant requested to speak to a detective, and Detective Raynor moved him to an interview room. There, Detective Raynor advised defendant of his Miranda rights. Defendant's answers were written down on a form and initialed by defendant to acknowledge the correctness of his answers. Defendant then waived his rights and made a voluntary statement, which lasted approximately one hour. He did not, however, give Detective Raynor consent to search his phone.

Defendant explained the night before the murder he slept in his car outside of his girlfriend's Freehold apartment because he had locked himself out of his home. He stated he had been "pissed off" and "ain't never had a day like th[at]." Defendant also explained when he saw the victim, he did not know him but assumed he was a resident of the Harding Road complex. He stated, "I just felt like a savage. That's all. F[***] it." Defendant admitted he "tried to kill [the victim]" and called his "[s]outh paw" assault a "death call" because the victim "didn't see [him] coming." Defendant said he used the car to "finish him off."

10

Defendant further explained he "burned [the victim's] money to show him" it "[was not] about the money," but he "needed [the victim's] keys to get away." Defendant also told Detective Raynor he attacked the victim because he was white:

> DET. RAYNOR:  What[] . . . set you off about him?
>
> [DEFENDANT]: He was white.   Old white man. Nothing.
>
> DET. RAYNOR:  Did he say anything to you?  Did he do anything?
>
> [DEFENDANT]:  Nope.  Didn't have to.

Defendant later continued:

> DET. RAYNOR: So, it could have been anybody there.
>
> [DEFENDANT]: Could have been anybody.   I wouldn't have gave a f[***].
>
>      . . . .
>
> DET. RAYNOR: If the white guy was an African-American man, would you have --
>
> [DEFENDANT]:  No, that probably --
>
> DET. RAYNOR:  -- felt the same way?
>
> [DEFENDANT]:  -- wouldn't have triggered me.  Not -- not at that -- no, that shit wouldn't have triggered me.

11

DET. RAYNOR:  The trigger was that he was a white guy.

[DEFENDANT]:  I would have let that man walk home.

DET. RAYNOR:  The trigger was that he was a white guy.

[DEFENDANT]:  Yeah.

DET. RAYNOR:  Okay.  That was my question.  So, if it were a female, that wouldn't have triggered you.

[DEFENDANT]:  A female?

DET. RAYNOR:  Because that's not who you are.

[DEFENDANT]:  No.

DET. RAYNOR:  You know what I mean?  If he were another race, that wouldn't have triggered you.

[DEFENDANT]:  Probably not.

Defendant also explained he "crashed up" his car when hitting K.W.'s car, but he "needed to get away," so he took the victim's car and went home.  He acknowledged the police had been trying to pull him over on his way home.  Defendant said when he got into his home, his mother had been on the phone and screamed his name, indicating to him he was "caught."

D.  <u>The Night Before the Assault.</u>

12

On April 30, 2018, around 11:00 a.m., defendant called his father, T.W., six times without an answer. T.W. called him back at 12:15 p.m. and asked if he was "okay." T.W. described defendant as "yelling and going into a rant," noting he did not understand what defendant was saying. Defendant hung up on his father.

Around 5:00 p.m., defendant was at a strip club in Sayreville when he and K.W. exchanged telephone calls and texts regarding the possibility K.W. was pregnant. Defendant and K.W. had been dating for about three to four months at the time.

Around 8:00 p.m. that same evening, defendant refused to stop when East Brunswick Police Officer Justin Schlusselfeld initiated a stop for a traffic violation using both his sirens and a "P.A." microphone. Defendant failed to pull over, and the pursuit was eventually terminated by Officer Schlusselfeld's supervisor. The State's psychiatric expert testified defendant later explained to him he did not stop because he had just met up with a coworker who wanted to buy drugs from him, and he believed his "coworker had set him up." Around 8:30 p.m., T.W. called defendant numerous times, believing defendant "needed help." When defendant did not respond, he texted, "Are you okay?" to which defendant did not reply.

 A-2895-22

Around 11:30 p.m., defendant arrived at K.W.'s home at the Harding Road complex, where she lived with her aunt and A.M., her aunt's then-husband. A.M. testified defendant knocked loudly on their door and appeared "upset," "angry," and "very agitated" in a way that was different than he had seen defendant before. Defendant refused to leave, was playing loud music out of his car, "pacing" quickly back and forth, "pleading" about needing to stay there, and speaking "in a loud and aggressive" manner.

K.W., however, testified defendant had not been angry or aggressive when she eventually met him outside to talk that evening; instead, she described him as "off," "all over the place," and "not making sense." She explained defendant "gave [her] a kiss and a hug" before she went back inside her home.

Defendant returned to the strip club, drank alcohol, and smoked marijuana. Around 1:00 a.m., he spoke to T.W. on the phone. T.W. testified his "takeaway" was he needed to get defendant to a hospital. He did not call the police, however, because he did not know where defendant was or "what municipality to call."

E.     Defendant's Mental Health.

At trial, it was undisputed defendant suffered from bipolar disorder, psychosis or a psychotic disorder, and cannabis use disorder. In support of his

14

insanity defense, defendant offered Dr. Fabian M. Saleh as an "expert in psychiatry with subspecialties in child and adolescent [psychiatry] and forensic psychiatry." In rebuttal, the State offered its own expert in the field of forensic psychiatry, Dr. Howard E. Gilman. The experts disagreed on whether defendant's mental illness prevented him from understanding the nature and quality of his actions.

Dr. Gilman testified he was in basic agreement with Dr. Saleh regarding defendant's diagnoses of bipolar disorder, cannabis use disorder, and "other specified personality disorder with antisocial features," explaining they were "basically [ninety-nine] percent in agreement around th[ose] diagnoses." Dr. Gilman, however, additionally diagnosed defendant with substance-induced psychotic disorder and alcohol use disorder.

Dr. Saleh opined because defendant suffered from mental illness, he was unable to appreciate and understand the nature and quality of the conduct he was charged with, and defendant therefore met the legal definition of insanity. Specifically, he explained:

> [A]t the time of the alleged offense conduct -- so, May 1[,] 2018 -- that [defendant] did suffer from a disease of mind, that he suffered from even prior to that date and subsequent to that date, but his reasoning was adversely affected by the condition that he suffers from and, hence, was not able . . . to appreciate and

15

understand the nature and quality of what he was accused of. [He d]id not understand the nature and quality of the offense conduct.

In so concluding, Dr. Saleh placed importance on the fact defendant had a documented history of mental illness and displayed symptoms of that illness before and after the assault, explaining:

There is a well-established disease that he suffers from, which is the [b]ipolar I disorder. . . .

And then if you, again, look specifically at the offense conduct, the way he is assaulting brutally a stranger out of the blue, for no rational reason, and not only that, but then he drives with his car over the victim for -- as far as I can tell, . . . no rational reason, and then engages in the behaviors that followed the offense, assault on the victim, getting into the victim's car, leaving his own car at the scene, driving away, and not just driving out[-]of[-]state, but driving home, [that] just doesn't add up in my opinion.

And then, though, . . . if we then look at his presentation right after the offense conduct, the interrogation with the officers, and I'm not suggesting that he was nonsensical, oblivious about what had happened, because he had some understanding of what had happened, but then the responses suggested that he didn't have that understanding when he says that he does not know what he did when he said . . . that his mind . . . is f-ed up, and where he says that he cares about the victim's life, yet then attempted to kill the victim and other statements along those lines. It just didn't make sense.

And then, again, if I now also juxtapose to this

16

what I learned about [defendant] when I talked to him, when he said that he's on autopilot, that he is not thinking. And, again, the issue is that this is not [an] offense that occurred over the course of three, four hours. It's a very brief period of time, where he is engaging in a set of behaviors that range from punching, kicking, pulling off the shirt of the victim, dragging the victim to the middle of the parking area, and then getting into his car, driving over the victim, and then getting into the victim's car and by then also burning money. I mean, this is [the] very period of time where he says[,] ["]I'm on autopilot,["] ["]I'm not thinking[."] [I]n my opinion, it adds up with what I learned about this case.

Conversely, Dr. Gilman concluded defendant did not meet the legal definition of insanity at the time of the assault, opining defendant "was suffering from a serious mental illness, but he understood what he was doing and . . . that what he was doing was wrong and, therefore, [defendant] did not meet [the] criteria for legal insanity." He further explained:

> I found that, in fact, [defendant] knew what he was doing and . . . he did a multi-step behavior in which he knew each step of the way what he was doing, and I explained . . . that with each step he knew what he was doing. He knew that he punched . . . [the victim]. He then said to himself ["]I'm in trouble, I'm going to jail. So, what the hell? What the F?["] And he then dragged . . . [the victim] from where he was into . . . some part of the parking lot, knowing that he was dragging him into the parking lot with the intent to run him over because he then got in his car and ran him over, possibly twice according to [defendant,] and then he went in [the victim's] pockets looking for the keys to . . . [the

17

victim's] car.

He then got into . . . [the victim's] car hearing the sirens of the police, and knowing that he needed to flee, and he then fled. And fled for a prolonged period of time.

So, each step of the way, according to . . . [defendant] himself, and it's also supported in part by what he then told the police, you know, a few . . . hours later [and] what . . . witnesses reported in terms of what they saw and all of that. Each step of the way he indicated that . . . he knew the nature and quality of each of his acts. He . . . didn't think he was, you know, fighting a god sent down from Mars . . . who was trying to destroy the world, he was angry and he punched this unknown stranger . . . who he knew was a person.

Rejecting defendant's insanity defense, the jury returned a guilty verdict on count one (first-degree murder), count four (first-degree bias intimidation), count five (second-degree eluding), count six (third-degree possession of a weapon for an unlawful purpose), and count seven (third-degree theft of movable property). On count three (first-degree robbery), the jury found defendant guilty of the lesser-included offense of theft from a person. On count two (felony murder), the jury found him not guilty. The court subsequently denied defendant's motion for a new trial.

A-2895-22

At the April 25, 2023 sentencing hearing, after merger of offenses[3] and granting the State's motion for extended term sentencing, the court sentenced defendant to a life term plus thirty-five years. On count one, it imposed a life sentence subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. On count three, theft from a person, the court issued a five-year sentence. On count four, bias intimidation, it sentenced defendant to a twenty-five-year extended term. On count five, eluding, the court imposed a ten-year sentence. On count seven, theft of movable property, it sentenced defendant to a five-year term. The court ordered counts one, four, and five to run consecutively, and it imposed all mandatory fines and penalties.

This appeal ensued.

## II.

Defendant raises the following points on appeal:

POINT I

THE STATE INTERFERED WITH THE JURORS' DELIBERATIONS BY TELLING THEM THAT DEFENDANT COULD NOT BE FOUND INSANE IF HE TRIGGERED HIS SYMPTOMS (Not Raised Below); ELICITING UNSUPPORTED EXPERT TESTIMONY ABOUT ALTERNATIVE DIAGNOSES; APPEALING TO THE JURY'S

---

[3] The court merged count six into count one for sentencing purposes, and it dismissed all related motor-vehicle tickets.

19                                                      A-2895-22

EMOTIONS (Partially Raised Below); AND IMPROPERLY ATTACKING THE DEFENSE EXPERT. (Partially Raised Below).

    A.   The State Improperly Told the Jury that It Could Not Find Defendant Legally Insane Based on His Alleged Substance Use and Lack of Medical Compliance.

    B.   The State Was Allowed to Undermine the Insanity Defense with Net Opinions About Alternative Diagnoses.

    C.   The State Was Allowed to Distract and Inflame the Jury with Irrelevant, Cumulative, and Highly Prejudicial Evidence and Comments about the Crime and Injuries.

    D.   The State Was Allowed to Improperly Attack the Defense Expert with Irrelevant and Misleading Information About His Compensation in Unrelated Matters.

POINT II

THE COURT REVERSIBLY ERRED IN FAILING TO SUPPRESS DEFENDANT'S CUSTODIAL STATEMENTS.

POINT III

THE TRIAL COURT ERRED WHEN IT REMOVED A JUROR WITHOUT GOOD CAUSE AND WHEN IT FAILED TO ENSURE THAT THE JURY WAS NOT CONTAMINATED.

A-2895-22

A. The Trial Court Improperly Removed Juror 14 Without Good Cause or, in the Alternative, Failed to Voir Dire the Remaining Jurors to Guard Against Contamination.

B. The Trial Court Erred in Declining to Voir Dire the Entire Panel After a Bible Was Left in the Jury Room.

POINT IV

DEFENDANT'S RIGHTS WERE DENIED DUE TO THE FAILURE TO RECORD HUNDREDS OF SIDEBAR CONFERENCES. (Not Raised Below)

POINT V

THE ERRORS' CUMULATIVE EFFECT DENIED DEFENDANT HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL. (Not Raised Below)

POINT VI

RESENTENCING IS REQUIRED BECAUSE THE COURT BASED THE LIFE-PLUS-THIRTY-FIVE-YEAR SENTENCE ON MULTIPLE ERRORS.

A. The Court Improperly Found and Weighed Multiple Aggravating and Mitigating Factors.

B. The Court Improperly Imposed Three Consecutive Terms.

C. The Court Wrongly Found Extended-Term Eligibility.

21

## A.

Defendant argues prosecutorial misconduct and evidentiary errors, both individually and cumulatively, affected the jury's deliberations and denied him his right to due process, thus requiring a new trial. First, he asserts the State's misstatement of the law on the insanity defense—namely, that defendant could not be found legally insane due to his lack of medical compliance and alleged substance abuse—was significant, inaccurate, and "clearly capable of misleading the jury." Second, defendant contends the trial court erred in permitting the State to mislead the jury with net opinions on his alternative diagnoses. Third, he claims the court erred in permitting the State to improperly appeal to the jury's emotions with irrelevant and prejudicial evidence regarding the victim's injuries and the brutality of the assault. Lastly, defendant contends the court improperly permitted the State to attack his expert, Dr. Saleh, regarding his compensation in unrelated litigation. Defendant argues each error was "individually and cumulatively capable o[f] leading the jury astray when considering Dr. Saleh's testimony and the key issue of whether [defendant] was legally insane."

1.

Defendant argues the State attempted to invalidate his insanity defense by telling the jury he "could not be acquitted by reason of insanity because he was responsible for 'triggering' his mental illness." He directs this court to several instances where he asserts the State's approach may have improperly influenced the jury, including its attempt to: "elicit[] extensive testimony about [defendant]'s use of marijuana and alcohol, and his failure to comply with medical treatment; question[] the psychiatric experts about how this conduct could have triggered or exacerbated [defendant]'s symptoms; and tell[] the jury that it could not find [defendant] insane if he was so affected." Defendant asserts the State's presentation was "clearly capable of affecting the jury's verdict on the key issue of insanity," thus requiring a new trial.

Defendant acknowledges this argument was not raised below. Accordingly, the challenge is subject to the plain error standard, see State v. Winder, 200 N.J. 231, 252 (2009), and warrants reversal only if we find the error was "clearly capable of producing an unjust result," R. 2:10-2.

"The insanity defense exists in criminal law not to identify the mentally ill, but rather to determine who among the mentally ill should be held criminally responsible for their conduct." State v. Singleton, 211 N.J. 157, 173 (2012).

Under our Criminal Code, defendants are afforded the opportunity to present an insanity defense pursuant to N.J.S.A. 2C:4-1, which provides:

> A person is not criminally responsible for conduct if at the time of such conduct [they were] laboring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act [they were] doing, or if [they] did know it, that [they] did not know what [they were] doing was wrong. Insanity is an affirmative defense which must be proved by a preponderance of the evidence.

"N.J.S.A. 2C:4-1 codifies the common-law M'Naghten[4] test for legal insanity, which was originally formulated in England in the 1840s." Singleton, 211 N.J. at 174. "In New Jersey, we adhere to the general proposition that a defendant who has the mental capacity to know basic societal mores that distinguish objectively between right and wrong is legally responsible for [their] criminal conduct." Id. at 160. Importantly, "[m]ental illness does not in and of itself eliminate moral blameworthiness under the test for criminal insanity enshrined in the Code of Criminal Justice . . . ." Ibid. "The insanity defense is not available to all who are mentally deficient or deranged; legal insanity has a different meaning." Cannel, New Jersey Criminal Code Annotated, cmt. 2 on N.J.S.A. 2C:4-1 (2025). "Our courts have long held that 'insanity is a defense

---

[4] M'Naghten's Case, 8 Eng. Rep. 718 (H.L. 1843).

to crime only when the diseased condition of mind was such that the defendant did not know the nature and quality of the act [they] w[ere] doing . . . .'" State v. Arrington, 480 N.J. Super. 428, 438 (App. Div. 2024) (quoting State v. Maioni, 78 N.J.L. 339, 341 (E. & A. 1909)).

Nevertheless, the State must still prove its case:

> The advancement of a claim of insanity under the Code does not relieve the State of its burden of proof. State v. Jimenez, 188 N.J. 390, 406 (2006); State v. Delibero, 149 N.J. 90, 99-100 (1997). To the contrary, the State remains "constitutionally responsible to prove every element of the offense beyond a reasonable doubt." Delibero, 149 N.J. at 100. However, juries must consider evidence of a defendant's insanity with respect to [their] ability to form the requisite mental state, which, as an element of the crime, must be proven beyond a reasonable doubt. Id. at 106.
>
> [State v. Handy, 421 N.J. Super. 559, 590 (App. Div. 2011) (citations reformatted).]

In claiming the State improperly urged the jury to reject his insanity defense based on his voluntary drug use and failure to take medication to treat his bipolar disorder, defendant relies on State v. Maik, 60 N.J. 203 (1972), overruled on other grounds by State v. Krol, 68 N.J. 236 (1975). In Maik, the defendant stabbed his classmate sixty-six times with a hunting knife, which the defense asserted occurred during an episode of "temporary insanity." Id. at 207. The evidence revealed the defendant was experiencing a "true schizophrenic

break" during the stabbing and was "obviously delusional." Id. at 210. Recitals of the defendant's thinking during the killing included his belief the victim wished to die, and one witness account was "specially laden with [the defendant's] religious allusions." Id. at 211-12. After the defendant's psychotic episode abated, he remained susceptible to further psychotic breaks, despite being in remission, if he were subjected to a new stress. Id. at 211. During the trial, the expert psychiatrists could not determine the specific factor that triggered the defendant's psychotic episode but found the possibilities included his voluntary drug use or "a romantic failure with a young lady." Id. at 211-12.

The defendant argued, "when a psychosis emerges from a fixed illness, [the court] should not inquire into the identity of the precipitating event or action." Id. at 216. The Court agreed and held "the underlying or latent personality disorder, and not merely the psychotic episode which emerged from it, is the relevant illness." Id. at 218.

Here, defendant claims the State improperly urged the jury to reject his insanity defense based on his substance use and failure to take medication, which he equates to speculating as to what "triggered" his mental illness, and contends Maik plainly instructs against such action. He objects to the State's questioning of both psychiatric experts about his drug and alcohol abuse,

26

arguing the State raised those issues to demonstrate he was responsible for exacerbating his mental health condition. Defendant makes the same argument regarding the prosecutor's summation, noting statements such as "there is medication and treatment available [to defendant] that he turned away from time and time and time again," and the victim "paid the price" for defendant's anger and aggression.

During the trial, Dr. Gilman opined defendant's "consumption of intoxicants play[ed] a role in his mental health" on May 1, 2018, and "the intoxicants either were a precipitant to or an exacerbator of his symptoms of bipolar disorder." He explained "using cannabis and . . . alcohol may have worsened [defendant's mental illness] symptoms, . . . which is[,] in part[,] why [he] diagnosed him with . . . substance[-]induced psychotic disorder." Moreover, Dr. Gilman concluded defendant "knew the nature and quality of his acts" on May 1, 2018, despite suffering from bipolar disorder, reasoning:

> [T]he multi-step behaviors that [defendant] undertook that morning, along with the reasoning that was going on in his mind at the time, which was that ["]I'm [in] trouble, I'm going to pay for this anyway so what the F,["] indicates that [defendant] knew what he was doing. He knew the actions. He knew the nature and quality of what he was doing. He knew the potential outcomes of what he was doing, you know, almost step by step.

Dr. Gilman specified "[defendant] knew the nature of and quality of what he was doing" when he "dragged [the victim] into the middle of the parking lot and ran him over," explaining that in concluding so, he "relied on the fact that [defendant] was feeling angry, that he said he knew he was in trouble, and said . . . basically, [']I don't care,['] and [']I might as well do what I want to do.[']"

Conversely, Dr. Saleh testified he did not have enough data to diagnose defendant with "substance use and cannabis induced psychosis" or "indicate whether or not marijuana and alcohol had any impact on him that night." He opined defendant was suffering from a manic episode "with psychotic features" during "the time of the offense conduct" stemming from his bipolar disorder. Responding to questioning regarding whether he considered diagnosing defendant with anti-social personality disorder, Dr. Saleh explained:

> [Defendant]'s case is all about bipolar disorder, all about a mental illness, and for that reason it would be, in my opinion, impossible really to say that we have a comorbid, co-existing condition going on in addition to bipolar disorder, anti-social personality disorder, because I would not know how you would differentiate.

Thus, the experts did not agree defendant's crime "emerged" from conduct attributable to his bipolar disorder diagnosis such that he was unable to understand the nature and quality of his conduct. Accordingly, the State contends its "theory appropriately argued that two things could be true: that

28

defendant could be mentally ill" but still "intentionally act out of rage caused by" his prior interaction with his girlfriend and the victim's race "and not his mental illness." For example, in summation, the State asserted:

> [T]he defense asked you . . . earlier this morning to decide whether [the victim]'s violent death was the result of wickedness or mental illness, but what if it was rage? Rage that exploded into wicked actions, anger[,] and aggression with no outlet. [K.W.] would not see him. Anger and aggression with no outlet. [K.W.] would not take his calls. Anger and aggression with no outlet. [K.W.] wanted to give him his key back to his apartment. Anger and aggression with no outlet. [K.W.] was trying to put distance between them. Anger and aggression with no outlet. No outlet[,] that is[,] until [the victim] stepped out of his car on that fateful morning, and . . . defendant had a focus.
>
> . . . .
>
> What did [the victim] do to become the focus of . . . defendant's rage? Nothing. Absolutely nothing. He was simply coming home from work and he was white, which was another trigger for . . . defendant as he, himself, told us.

The State never conceded defendant's mental illness was the underlying cause of the murder or that the illness had been temporarily triggered in a delusional outbreak, as was the case in Maik. See 60 N.J. at 207.

In support of his argument, defendant emphasizes the following statement the State made during summations:

[Defendant] smoked marijuana and drank liquor. Now, keep in mind, we don't have to prove a DUI. There's nothing in the insanity statute that says [defendant] has to be .08 or higher. But we have to show that smoking marijuana and drinking alcohol affected him. It affected him, and I think all of you can see that.

We know that he purchased marijuana[,] also a purposeful act.

Defendant characterizes this statement as "explicitly telling the jury that it had to reject the insanity defense if it found that [he] was 'affected' by drugs or alcohol." However, taken in its full context as demonstrated below, that statement was designed to show the jury one of the many purposeful acts defendant took to illustrate his "sane" state of mind before, during, and after the assault, in order to convince the jury defendant understood the wrongfulness of his behavior. In its summation, the State asserted defendant knew "exactly what he was doing" on the day of the murder, and it proceeded to "go through what those purposeful and knowing actions were." Specifically, it argued:

[Defendant] changed his ESPN password. . . . It takes purposeful actions, and it's important to know where his mind was at leading into this crime.

He engaged in that eluding that we spoke about, and in that he maneuvered his way home, he parked his car and he fled the area. That was on April 30[].

He played cards with friends, also a very intricate act and game.

He smoked marijuana and drank liquor. Now, keep in mind, we don't have to prove a DUI. There's nothing in the insanity statute that says he has to be .08 or higher. But we have to show that smoking marijuana and drinking alcohol affected him. It affected him, and I think all of you can see that.

We know that he purchased marijuana[,] also a purposeful act.

. . . .

He followed [A.M.]'s order to move the car and turn down the radio. . . .

He navigated his way back to Sayreville. He went to a strip club.

He then drove back from Sayreville to Freehold . . . [and] parked outside of [his girlfriend's] ho[me], not some random area.

He beeped the horn two times trying to get her attention. . . .

He drove off and then returned. He found her car again, which was . . . not parked outside of her home, but he found it and located it again.

He . . . made a choice to pick . . . [the victim] based on his race and color. . . .

He returned to [the victim] after having an opportunity to stop, and . . . continued that assault two times.

He said, ["f***] you["] to [the victim]. Identifying [the victim] . . . . [H]e was contextually

31

appropriate in what he said.

He identified the assault as harmful to [the victim]. He knew that he was causing pain to him. He dragged [the victim] into the road so he didn't try to hit [the victim] on the side where [the victim] first was laying down, [defendant] knew that he couldn't drive his car there. He had to pull [the victim] into the parking lot.

He got back in his car, put the car in drive, and pressed on the gas. He then got out of the car to make sure he wasn't dragging the body.

He ran [through the victim]'s pockets and took his keys and his money. . . . He knew that he needed [the victim]'s keys and he needed his car to get away. He burned the money with a lighter and he explained that action as weird as it may seem when you first heard it, he had . . . a reasonable explanation. ["]I wanted to show [K.W.] that this wasn't only about the money.["] It was about an example. . . . He put on rap music in [the victim]'s car.

He left before the police arrived . . . . He . . . fled the area. . . .

He operated [the victim]'s motor vehicle using blinkers, brakes, avoided collisions, county roads, Route 18, two major intersections. . . .

. . . .

He stops the car on Bordentown Avenue and exits. . . . He doesn't go to somebody else's house. He runs home.

He referenced going to crisis. . . . He talked to the

A-2895-22

police and gave them his name, his date of birth, [and] the correct address. . . .

He rapped actual songs, eight of them, with the correct lyrics and the same tone and tune as those songs.

And finally[,] he understood his <u>Miranda</u> rights when they brought him in to give [his] statement.

Defendant, in isolating the single statement regarding his substance use from the balance of the prosecutor's long list of behaviors, improperly suggests the State was exclusively focused on his substance abuse, rather than on showing the jury the many purposeful and "sane" acts defendant performed that day.

The State's summation focused not on the cause of defendant's mental illness, but rather on how defendant knew the nature and quality of his actions were wrong, and it attempted to demonstrate defendant's conduct was not the result of his mental illness. It argued defendant "acted purposely and knowingly," stressing facts that suggested he was aware of his actions before, during, and after the crime, contending he was rational enough to take various steps to commit the crime and escape, and questioning the weight to be given to Dr. Saleh's testimony. The State also contended defendant's rage stemmed from his fight with his girlfriend and the victim's race, asserting: "What did [the victim] do to become the focus of . . . defendant's rage? Nothing. Absolutely nothing. He was simply coming home from work and he was white, which was

33

another trigger for . . . defendant[,] as he, himself, told us."

Importantly, there is no argument the trial court erred in instructing the jury on defendant's insanity defense. The court ultimately posed the following question to the jury: "[D]id [defendant]'s mental disease or defect, to wit [b]ipolar . . . disorder, manic episode with psychotic features[,] interfere with his ability to appreciate the nature and quality of the act or prevent him from using his faculties to comprehend what he was doing was wrong[?]" There is no indication the jury was directed to consider a voluntary triggering of defendant's mental illness as a reason, or an "off-ramp" as defendant argues, to reject the insanity defense. Thus, the court's instruction clearly and properly defined the question the jury had to answer under the law. In short, we find no plain error.

2.

Defendant argues the State improperly undermined his insanity defense, which he asserts was premised on how his bipolar disorder prevented him from understanding his actions, by eliciting testimony from Dr. Gilman regarding his two additional diagnoses—substance-induced psychosis and antisocial personality disorder—"that could explain his behavior without allowing him to be found insane." Defendant asserts Dr. Gilman's testimony regarding those

34

diagnoses should have been excluded as inadmissible net opinions, given his conclusions were supported only by "his own experience or guesswork," rather than the authoritative text for defining mental disorders, the Diagnostic and Statistics Manual (DSM).

Defendant objected to Dr. Gilman's testimony regarding those diagnoses and his ultimate opinion as to whether defendant was not guilty by reason of insanity and moved to strike the testimony, arguing they were improper net opinions. The trial court rejected his argument:

> As the [c]ourt understands[,] the argument by [the] defense is that Dr. Gilman's testimony that he used his experience to also guide his ultimate diagnosis makes his opinion a net opinion and that his failure to solely rely on and be strictly governed by the criteria in the DSM-5 also warrants the [c]ourt[']s discarding his opinion and ruling it to be precluded. The [c]ourt is unpersuaded by all those arguments[] and unequivocally rejects them.

The court found "Dr. Gilman's qualifications as an expert . . . were not challenged" by the defense, and thus, it was "well within [Dr. Gilman's] purview to testify based upon his specialized knowledge, skill, experience[,] and training." It further found Dr. Gilman and Dr. Saleh "essentially testified substantially the same as to the use of the DSM-5 as a criteria," and it held "nothing preclude[d] those experts . . . from relying on their specialized training,

35

their expertise[,] and their experience." In addition, the court was "satisfied" Dr. Gilman provided "the why[] and wherefore[] for his opinion" based on facts he found relevant and explained it was "up to the jury to determine what weight, if any, to give to those facts, or[,] as the instructions ha[d] indicated to the jurors, whether those facts actually even exist."

N.J.R.E. 702 and 703 together govern the admissibility of expert testimony. Townsend v. Pierre, 221 N.J. 36, 53 (2015). "Appellate courts generally 'defer to a trial court's evidentiary ruling absent an abuse of discretion.'" State v. Burney, 255 N.J. 1, 20 (2023) (quoting State v. Garcia, 245 N.J. 412, 430 (2021)). "A court abuses its discretion when its 'decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Ibid. (quoting State v. Chavies, 247 N.J. 245, 257 (2021)) (internal quotation marks omitted).

Rule 703 addresses the foundation of expert testimony, providing:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the proceeding. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

"The net opinion rule, a corollary of N.J.R.E. 703, 'forbids the admission into

evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Burney, 255 N.J. at 23 (quoting Townsend, 221 N.J. at 53-54); see also Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011). "The rule requires that an expert 'give the why and wherefore that supports the opinion, rather than a mere conclusion.'" Townsend, 221 N.J. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)) (internal quotation marks omitted). Experts are encouraged to use "education, training, and most importantly, [their] experience" to provide a "sound foundation for [their] opinion." See State v. Townsend, 186 N.J. 473, 495 (2006); Ehrlich v. Sorokin, 451 N.J. Super. 119, 135 (App. Div. 2017) (citing Townsend v. Pierre, 221 N.J. at 52) ("giving deference to the trial judge's decision on expert testimony," this court found "no error" in admitting evidence based upon the expert's "medical experience"). In Townsend v. Pierre, our Supreme Court provided the following guidance:

> The net opinion rule is not a standard of perfection. The rule does not mandate that an expert organize or support an opinion in a particular manner that opposing counsel deems preferable. An expert's proposed testimony should not be excluded merely "'because it fails to account for some particular condition or fact which the adversary considers relevant.'" Creanga v. Jardal, 185 N.J. 345, 360 (2005) (quoting State v. Freeman, 223 N.J. Super. 92, 116 (App. Div. 1998)). The expert's failure "to give weight

37

to a factor thought important by an adverse party does not reduce [their] testimony to an inadmissible net opinion if [they] otherwise offer[] sufficient reasons which logically support [their] opinion." Rosenberg v. Tavorath, 352 N.J. Super. 385, 402 (App. Div. 2002) (citing Freeman, 223 N.J. Super. at 115-16). Such omissions may be "a proper 'subject of exploration and cross-examination at a trial.'" Ibid. (quoting Rubanick v. Witco Chem. Corp., 242 N.J. Super. 36, 55 (App. Div. 1990)); see also State v. Harvey, 151 N.J. 117, 277 (1997) ("'[A]n expert witness is always subject to searching cross-examination as to the basis of his opinion.'") (quoting State v. Martini, 131 N.J. 176, 264 (1993)).

[221 N.J. at 54-55 (citations reformatted).]

The Court further noted, "An expert's conclusion 'is excluded if it is based merely on unfounded speculation and unquantified possibilities.'" Id. at 55 (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997)) (additional internal quotation marks omitted). A defect will be found when the expert's "speculative opinions or personal views" are not supported by the factual record. Ibid.

Here, defendant emphasizes Dr. Gilman did not "adhere" to the DSM despite acknowledging the DSM is "universally recognized among psychologists and psychiatrists [and] relied upon in diagnosing mental health disorders." Indeed, "[g]eneral acceptance of the DSM in the psychiatric community is beyond dispute." State v. King, 387 N.J. Super. 522, 544 (App.

Div. 2006). However, defendant has not cited any authority for the proposition an expert's failure to rely upon the DSM when classifying a defendant's mental disorder renders it a net opinion. Nevertheless, Dr. Gilman indicated on cross-examination he relied upon the DSM in diagnosing defendant, which the trial court noted in denying defendant's motion to strike his testimony as impermissible net opinions.

In describing how he arrived at his opinion and his evaluation of the case, Dr. Gilman explained to the jury he

> reviewed a large number of documents. Those included things like police and detective reports regarding the alleged crime. They included videotapes . . . of some of [defendant's] behaviors and actions occurring around that time, specifically just prior to and just after [defendant]'s arrest. It included medical and psychiatric reports going back some ten years or so of [defendant]. It included witness statements . . . .

Dr. Gilman noted there is "still . . . no way of making a diagnosis based upon" concrete data "like blood tests or x-rays" in the field of psychiatry. Thus, he continued, psychiatrists "rely, to a large extent, on [a person]'s history," symptoms, including the duration and progression of their symptoms, and treatment plans "to ultimately come up with a diagnosis." He further explained how psychiatrists perform a "mental status examination" of a person to evaluate their "psychiatric and psychological abilities," including their alertness,

responsiveness, speech, logic, coherence, mood, memory, ability to stay on topic, temporal awareness, awareness of their medical diagnoses, and understanding of the criminal charges against them and the consequence of the crimes. Dr. Gilman found defendant "had no significant findings on that mental status exam, except that he seemed to be doing well."

With respect to diagnosing defendant with substance-induced psychosis and substance use disorders, Dr. Gilman explained his diagnoses were made after speaking with defendant, who he noted "readily admitted" to using marijuana and alcohol, and by reviewing defendant's medical records in which defendant had been previously diagnosed with "substance use disorders." He supported his opinion with facts, his professional experience as a forensic psychiatrist, and, even at times, the DSM language, describing to the jury how the latest version of the DSM replaced the word "abuse" with "use disorder" to avoid "the negative impact" of the word. Dr. Gilman testified:

> I diagnosed [defendant] with cannabis use disorder and alcohol use disorder primarily based upon the use of those substances and its negative impact on his life. So, one can . . . use cannabis or alcohol and it doesn't have a negative impact . . . on your life, and then it wouldn't be a substance use disorder. But when it begins to affect things like your work, your relations with family, . . . your ability to get along in society, then it becomes an illness . . . or a use disorder. So, I felt that [defendant] had those.

Dr. Gilman explained some of the "negative impacts" on defendant's life he considered in diagnosing defendant with antisocial personality disorder, including defendant's prior contacts with the law, behavior in school, ongoing conflicts with his mother, impulsive behavior, and two suicide attempts, noting people who suffered from bipolar disorder and/or antisocial personality disorder have "higher rate[s] of substance abuse." Based on this testimony, the trial court did not err in finding Dr. Gilman gave "the why and wherefore" supporting his diagnoses, as he properly used his education, training, and experience to draw the connections for the jury, as required by Townsend v. Pierre and State v. Townsend. See 221 N.J. at 54; 186 N.J. at 495.

Dr. Gilman also testified he was "careful" in diagnosing defendant with substance-induced psychosis disorder because defendant had not had any blood testing done for substance use immediately after the assault, the only time it would have been detectable, but acknowledged that diagnosis was "a little bit . . . speculative" for that reason. He continued:

> But I felt that given the level of his symptoms and given the fact that he had smoked a whole ounce of marijuana literally . . . [twelve] to [sixteen] hours before the crime, . . . I thought that . . . plus his use . . . of . . . alcohol . . . . had an impact on his overall mental state, and that's why I included th[e substance-induced psychotic disorder] diagnosis.

41

When cross-examined on his "speculative" diagnosis, Dr. Gilman further explained:

> [A]ny diagnosis is not a [one hundred] percent process. What . . . I mean by that is . . . there is some amount of -- speculation wouldn't be the right word, but there's some amount of . . . unknowables when one makes a diagnosis, and you're making a diagnosis primarily based upon history, symptoms, current mental status, and . . . also some biopsychosocial factors that might influence all of those things, with the understanding that this is not an absolute. This is a best working diagnosis at the current time . . . .

This is not the type of speculation cautioned against in Townsend v. Pierre, however, because Dr. Gilman's opinion did not "diverge[] from the evidence"; rather, he applied his medical knowledge and professional experience when diagnosing defendant. See 221 N.J. at 55, 57.

Thus, we conclude the trial court did not misapply its discretion in denying defendant's motion to strike Dr. Gilman's testimony. Defendant's arguments, as the court noted, more properly go to the reliability of Dr. Gilman's diagnoses and the weight the jury should place on them but do not demonstrate Dr. Gilman offered impermissible net opinions. In short, Dr. Gilman's testimony was supported by record facts, the DSM, and his medical knowledge and experience, and the jury was free to accept or reject his testimony as the ultimate trier of fact.

42

3.

Defendant argues the prosecutor, contrary to N.J.R.E. 403, "distract[ed] and inflame[d] the jury with irrelevant, cumulative, and highly prejudicial" evidence regarding the victim's injuries, medical treatment, and suffering, through the testimony of five medical professionals and introduction of graphic photos and videos. He claims the State improperly devoted a "full day" of "unnecessary" and "graphic" testimony to the victim's medical condition and treatment. Defendant further alleges there was prosecutorial misconduct, which he claims occurred during the State's opening and closing statements, designed to improperly appeal to the jurors' emotions. In sum, defendant claims the State's inflammatory evidence and inappropriate commentary created a miscarriage of justice, warranting a new trial, given the trial court's failure to take curative action.

We review the trial court's evidentiary decisions for abuse of discretion. State v. Cole, 229 N.J. 430, 449 (2017) (noting "substantial deference" is afforded to the trial court and only a "clear error of judgment" can demand reversal); State v. McDougald, 120 N.J. 523, 582 (1990) ("The admission of photographs of the victim of a crime rests in the discretion of the trial court, and the exercise of its discretion will not be reversed in the absence of a palpable

A-2895-22

abuse thereof.").  Conversely, any alleged improper remarks made by the prosecutor should be reversed only if the prosecutor's misconduct "was so egregious that it deprived the defendant of a fair trial."  State v. Frost, 158 N.J. 76, 83 (1999).

a.  Evidentiary Decisions.

After conducting a Rule 403 hearing, the trial court held the testimony of the medical personnel who treated the victim was relevant because the State bears the "very high" "burden to prove each and every element of the offense beyond a reasonable doubt," noting the State must also connect the victim's death to the injuries he suffered from the assault because he survived and received treatment for approximately five months after the incident.  It further noted there was no stipulation as to causation, and regardless, "the jurors are instructed that even undisputed facts can be accepted or rejected by the jury in reaching a verdict."  Acknowledging the State is the architect of its case in chief, the court also held it was not "unduly prejudicial" for the State, given its burden, "to present [its] evidence through the testimony of [the victim's] treating physicians, rather than relying on the hearsay [evidence] presented by a medical examiner or . . . stipulations."

Defendant argues the "photos of [the victim]'s body" and the blood on the

bottom of defendant's car were admitted in error because they were "clearly capable" of improperly shifting the jury's focus from his insanity defense to the gruesome details of the crime. Here, the trial court conducted a thorough analysis of each photo of the victim's body, finding some admissible and relevant but many others inadmissible because they were "particularly shocking," "duplicative," or both. With respect to the photos of the blood on defendant's car, the court found them admissible because each photo depicted a different part of defendant's car, showed where the State collected DNA samples, or how the State conducted its investigation.

Defendant also contends the responding officer's mobile video recorder (MVR) video showing the victim on the ground after the assault and A.M.M.'s 9-1-1 call "did not relate to a material issue and only made it more likely that the jury would be improperly swayed by its sympathies and emotions."[5] As a starting point, the court initially held the MVR video was admissible, stating:

> [T]he MVR [video] is probative. No question. [The court is] . . . going to . . . admit the MVR [footage], because it is certainly probative, particularly the portion where [the responding officer] arrives on the scene. It clearly shows the layout of the parking lot, it shows where the dumpsters are, and then, as he turns and parks his vehicle, it shows the victim, [and] it

___

[5] There was no defense objection to either A.M.M.'s or N.A.'s 9-1-1 calls. Accordingly, our review here is for plain error.

A-2895-22

shows where . . . defendant's car is. And, again, and at the beginning of those portions, it also shows the relationship of the other vehicles . . . which certainly can assist, no question, the jurors in understanding the scene.

The State also redacted and shortened the MVR video pursuant to the trial court's instructions. The court held, after "view[ing] the video numerous times," the portion of the video depicting the victim with audio was admissible. It reasoned, although the video "could, to some extent, be a bit disturbing" and did capture "some moans," "you . . . can't even discern blood," and it was helpful for the jury to evaluate the credibility of the witnesses testifying about the events. The court found the defense's description of the MVR video to be "a bit dramatized" and "not as inflammatory" as argued, noting the footage was "not overly gruesome in any way." The court also found the audio of the victim responding to questions about his medical condition to be admissible under Rule 803(c)(4) as "statements related to . . . the victim's condition and . . . for the purposes of . . . diagnoses and treatment."

"Relevancy is the hallmark of admissibility of evidence." State v. Williams, 240 N.J. 225, 235 (2019) (quoting State v. Darby, 174 N.J. 509, 519 (2002)). "Relevant evidence" is defined as "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the

action."  N.J.R.E. 401.

N.J.R.E. 403 provides "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of:  (a) [u]ndue prejudice, confusion of issues, or misleading the jury; or (b) [u]ndue delay, waste of time, or needless presentation of cumulative evidence."  "For exclusion, the evidence must be more than prejudicial:  '[d]amaging evidence usually is very prejudicial but the question here is whether the risk of undue prejudice was too high.'"  State v. Trinidad, 241 N.J. 425, 449 (2020) (alteration in original) (quoting Cole, 229 N.J. at 448).  Indeed, because damaging evidence demonstrating guilt is usually very prejudicial, "[t]he mere possibility that evidence could be prejudicial does not justify its exclusion."  State v. Morton, 155 N.J. 383, 453-54 (1998).

Even where evidence is highly damaging to a defendant's case, that cannot serve as an independent basis to exclude otherwise admissible and probative evidence.  State v. Brockington, 439 N.J. Super. 311, 333 (App. Div. 2015). "Evidence claimed to be unduly prejudicial is excluded only when its probative value is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the issues in the case."  State v. Long, 173 N.J. 138, 163-64 (2002) (alteration in original) (quoting State v. Koskovich, 168 N.J. 448, 486

47

(2001)) (internal quotation marks omitted). Moreover, our Supreme Court cautions, "[t]hat evidence is shrouded with unsavory implications is no reason for exclusion when it is a significant part of the proof. The unwholesome aspects, authored by [a] defendant [themself], if the evidence be believed, [is admissible if] inextricably entwined with the material facts." Long, 173 N.J. at 165 (first and last alterations in original) (quoting State v. West, 29 N.J. 327, 335 (1959)) (internal quotation marks omitted).

Defendant relies upon State v. Johnson, 120 N.J. 263 (1990), in support of his claim the trial court erred in admitting testimony and photos of the victim's injuries and defendant's blood-stained car because it impermissibly redirected the jury's attention away from the issue of insanity. In Johnson, the Court held exposing the jury to "numerous crime-scene photographs depicting the victims' bodies, as well as forty-two slides depicting blood-spatter exemplars," created a substantial danger of undue prejudice. 120 N.J. at 298-99. While it reversed on other grounds, the Court "disagree[d] with the trial court's ruling that the blood-spatter testimony [wa]s admissible because it [wa]s part of the entire picture of the crime," explaining "[a]lthough th[at] testimony is not irrelevant, it is largely corroborative of other, essentially unchallenged testimony indicating the [victim's] manner of death. Thus, it was only minimally probative of [the]

defendant's guilt." Ibid. It further explained the testimony, which extended over the course of an entire day, "could not help but focus the jury's attention on the gruesome details of the condition of the victims' bodies, rather than on [the] defendant's guilt." Id. at 298. The Court also noted, "in order to be admissible, photographs must be 'logically relevant' to an issue in the case." Id. at 297 (quoting State v. Bey (Bey I), 112 N.J. 123, 182 (1998)).

Likewise, defendant directs this court to State v. Walker, 33 N.J. 580 (1960), for the same proposition. In Walker, the Court held the trial court erred in admitting "gruesome" photographs of the victim's brain, given a photograph of the victim's head showing the bullet's entry point had been admitted into evidence without objection. Id. at 596. It reasoned:

> In the present case, the photographs [of the victim's brain] could only have been introduced to establish the cause of death. But there was ample testimony by the medical examiner and the pathologist as to the cause of death. Indeed, it was uncontested. There was no evidence in the case which required buttressing with these photographs of the victim's brain which we consider to be gruesome. We conclude that their relevance as evidence was substantially outweighed by their inflammatory nature and that if the state of proofs is the same at the retrial they should not be admitted in evidence.
>
> [Ibid.]

In State v. Sanchez, this court noted "[p]ictures of a murdered body are

likely to cause some emotional stirring in any case, but that of itself does not render them incompetent." 224 N.J. Super. 231, 249 (App. Div. 1988). Although the manner of the victim's death was not disputed, the trial court nonetheless admitted photographs of the victim into evidence, including "close-ups of the gunshot wounds on the victim's hand, chest cavity[,] and face" and images depicting the "victim's body on the floor in the kitchen." Id. at 249. We found "the photographs were introduced to show the viciousness of the attack" and were therefore "properly admitted to negate any inference that the degree of culpability of [the] defendant was anything less than a knowing or purposeful homicide." Id. at 250.

Here, defendant avers the trial court erred in permitting the State to present a "full day" of testimony devoted to the victim's medical condition and treatment, which was comprised of two medical responders, two treating physicians, and an autopsy physician. He asserts the jury improperly heard from the medical responders the victim had "tire tracks across his abdomen" and "burn charring," "was pleading, 'please help me, please don't let me die,'" and had "decompensate[d]." Defendant also argues the responders' use of words like "cardiac arrest" and "clinical death," and their description of an unsuccessful attempt to intubate the victim, were overly prejudicial.

Specifically, defendant contends the following testimony offered by Dr. Pratt, the trauma surgeon who treated the victim at JSUMC, was overly prejudicial: the victim was "without signs of life" upon his arrival; he went into cardiac arrest "[a]t least four times"; the victim required a tracheostomy that included "mak[ing] an incision on [his] neck" "and placing the tube into the airway"; when describing the treatment of the victim's collapsed lung, Dr. Pratt's statements that the "chest tubes" "re-expand[ed] [his] lungs"; the victim received "blood transfusions" through a "large IV that[ was] placed in the groin" to restore his circulation; the victim's biggest medical complication required a "catheter in [his] brain" for drainage; and the victim was in a "persistent vegetative state." Defendant notes, during this testimony, Dr. Pratt also identified photos of the victim, his injuries, and his medical treatments.

Defendant also argues the testimony of Dr. Narasimhaswamy, who treated the victim in his final month of life at Specialty Hospital, was prejudicial, including her statements the victim: had "multiple infections," was "fighting the ventilator," received medication for "pain and anxiety," had deteriorating "kidney function[]," and eventually was unable to "tolerate . . . feedings" because food was "backing up into his stomach."

Finally, defendant contends he was prejudiced by the testimony of Dr.

51

Guzzetta, who performed the autopsy, which he avers contained "unnecessary details" regarding the victim's injuries, including that he had "a shunt in his head," a "Foley catheter," "[s]cars from other procedures," fractures, "bruising of the lung," and "a lot of disease process" from "being hospitalized for so long." Defendant also complains of Dr. Guzzetta's testimony indicating the victim had "raging pneumonia" from being intubated, which started "eating . . . [his] lung tissue," and Dr. Guzzetta's testimony the victim's brain started to "liquefy."

As an initial matter, the complained of testimony appears to have collectively taken less than three hours because on the same day the court also conducted housekeeping matters and conferences, swore in the jury, and counsel completed opening statements. Moreover, we conclude the testimony was relevant to determining defendant's guilt, as the State retains the burden of proving all elements of the crimes charged beyond a reasonable doubt, even when the defendant proffers an insanity defense. See State v. Fierro, 438 N.J. Super. 517, 525-26 (App. Div. 2015). Because the victim survived for approximately five months after the assault, the State was required to clearly connect his death to the injuries he sustained. Each physician was introduced to explain the phases of the victim's injuries and his downward spiral through two hospitalizations. There was nothing duplicative about their testimonies. The

trial court emphasized:

> [T]his case is a bit unusual in the sense that, because of so much time that went by and that the ultimate demise of the victim in this case occurred due to complications and the progression of various injuries, the [c]ourt does find that it is important for the medical information to be presented to the jury, because ultimately the jury does have to determine that and does have to make findings of fact as to the progression of those injuries and the ultimate causation of death, which, unlike other cases, where perhaps it would be more obvious, here they do have to follow that progression and those complications and ultimately make those findings.

Defendant's tactical decision to assert the insanity defense cannot be used as a sword to exclude probative admissible evidence. See State v. Wakefield, 190 N.J. 397, 430 (2007) (explaining the defendant's "unqualified and unrestricted admission of guilt for the murders of [the victims] did not, standing alone, provide him the procedural advantage of barring proofs of those crimes as part of the State's case"). Thus, we discern no error in the court's admission of this evidence, as the record does not reflect the prejudicial value outweighed the probative value of this medical testimony.

Regarding the admissibility of the photographs and MVR footage, we first note the trial court conducted a thorough pre-trial hearing and made a relevancy and probative value determination for each challenge the defense raised. Indeed, the State sought to admit additional photos the court excluded. The court's

53

analysis included both an admissibility determination to find the evidence "'logically relevant' to an issue in the case," Johnson, 120 N.J. at 297 (quoting Bey I, 112 N.J. at 182), and a secondary finding weighing the probative value of such admissible evidence against its prejudicial quality. Regarding the photographs of the victim's injuries it found admissible, the court reasoned they were relevant because the State was attempting to demonstrate the assault was committed by defendant's own hands and the injuries were consistent with being run over by a car. Moreover, the court noted the admitted photographs included images "where much of the blood appears to have been cleaned off" and closeups of only necessary details that did "not show anything particularly alarming, other than the closeup of the actual injury to [the victim's] abdomen." Accordingly, we find no misuse of discretion in the admission of those photographs.

Next, as to the trial court's evidentiary decision to admit the photographs of the car locations with blood splatter, we likewise find no misuse of the court's discretion. The court determined the defense's stipulation to the DNA specimens recovered from the vehicle matching the victim's DNA did not demonstrate necessary facts, such as where the specimens were found, how the forensic investigation was conducted, or the mode of the assault. In addition, the court limited the proffered photographs, excluding those it believed to be duplicative.

Finally, regarding the MVR video, the trial court entertained multiple arguments before arriving at its final decision to admit portions of the recording. The court viewed the MVR video with and without audio "to discern [its] probative verses prejudicial" value. It recognized the MVR footage was valuable to geographically orient the jury and capture the scene upon police arrival, reasoning all other photographs only showed the scene after the police arrived and the vehicles had been moved. Moreover, the court found the MVR footage was not as inflammatory as the defense had argued, and it further reasoned its admission would allow the jury to assess witness credibility and the victim's injuries. It determined the audio of the victim's responses to medical questions was admissible because the statements were aimed at assessing his condition. Finally, the MVR video was significantly reduced in length, to less than ten minutes, as various segments the court found irrelevant, duplicative, and inadmissible were redacted. Following our review of the evidence, we determine the court did not misapply its discretion in admitting the MVR footage in this limited fashion.

### b. Prosecutorial Misconduct.

Defendant also challenges the State's conduct during its opening and closing statements. Statements intended to arouse sympathy for a victim and

A-2895-22

anger toward a defendant are not permitted because they are prejudicial. See State v. W.L., 292 N.J. Super. 100, 110-11 (App. Div. 1996). "[T]he prosecutor may not make 'inflammatory and highly emotional' appeals which have the capacity to defer the jury from a fair consideration of the evidence of guilt." Id. at 111 (quoting State v. Marshall, 123 N.J. 1, 161 (1991)).

Here, the defense did not object to any comments the State made during its opening statement. See R. 1:7-2 (instructing the plain error standard applies). Similarly, of the numerous statements defendant now challenges, he only logged a single objection during the State's summation. Therefore, this issue is reviewed for plain error, and reversal is unwarranted unless the error was "of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2; see also State v. McNeil-Thomas, 238 N.J. 256, 276 (2019) (quoting State v. Feaster, 156 N.J. 1, 64 (1998)) (finding "a determination as to whether a prosecutor's comments had the capacity to deprive [a] defendant of a fair trial must be made 'within the context of the trial as a whole'"). "Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial. Failure to make a timely objection indicates that defense counsel did not believe the remarks were prejudicial at the time they were made." State v. Timmendequas, 161 N.J. 515, 576 (1999) (citation omitted); see also Frost,

158 N.J. at 83-84.

A criminal conviction will be reversed based on prosecutorial misconduct only if "the conduct was so egregious as to deprive [a] defendant of a fair trial." Wakefield, 190 N.J. at 437 (quoting State v. Papasavvas, 163 N.J. 565, 625 (2000)). This means "the prosecutor's conduct must have been clearly and unmistakably improper, and must have substantially prejudiced [the] defendant's fundamental right to have a jury fairly evaluate the merits of [their] defense." Id. at 438 (quoting Papasavvas, 163 N.J. at 625) (internal quotation marks omitted). "[E]ven if the prosecutor's comments could be termed questionable," a new trial is not warranted unless the comments are "sufficiently severe" to show a clear potential for prejudice. Id. at 440.

Our Supreme Court has recognized the "role [of a prosecutor] to be 'uniquely challenging because it is a double calling -- to represent vigorously the [S]tate's interest in law enforcement and at the same time help assure that the accused is treated fairly and that justice is done.'" State v. Williams, 244 N.J. 592, 607 (2021) (quoting McNeil-Thomas, 238 N.J. at 274). While a prosecutor may "strike hard blows, [they are] not at liberty to strike foul ones." State v. Farrell, 61 N.J. 99, 104-05 (1972) (quoting Berger v. United States, 295 U.S. 78, 88 (1935)).

Prosecutors are "expected to make vigorous and forceful closing arguments to juries." Frost, 158 N.J. at 82. They "are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." Ibid. A prosecutor "is entitled to be forceful and graphic in [their] summation to the jury, so long as [they] confine[] [them]self to fair comments on the evidence presented." Timmendequas, 161 N.J. at 587 (quoting State v. DiPaglia, 64 N.J. 288, 305 (1974) (Clifford, J., dissenting)). A reviewing court evaluates challenged remarks not in isolation but in the context of "the summation as a whole," State v. Atwater, 400 N.J. Super. 319, 335 (App. Div. 2008), and "in the context of the entire record," State v. Bey (Bey II), 129 N.J. 557, 622 (1992).

Still, a prosecutor's summation "must be limited to the facts in evidence and inferences reasonably to be drawn therefrom." Bey II, 129 N.J. at 620. While counsel is to be given broad latitude in summation, they may not misstate evidence or otherwise distort the factual picture. Geler v. Akawie, 358 N.J. Super. 437, 467 (App. Div. 2003). Specifically:

> Counsel may argue from the evidence any conclusion which a jury is free to reach. Indeed, counsel may draw conclusions even if the inferences that the jury is asked to make are improbable, perhaps illogical, erroneous or even absurd, unless they are couched in language transcending the bounds of legitimate argument, or

there are no grounds for them in the evidence.

> [Colucci v. Oppenheim, 326 N.J. Super. 166, 177 (App. Div. 1999) (citation omitted).]

In addition, prosecutors are permitted to respond to arguments raised by defense counsel if they do not stray beyond the evidence. State v. Munoz, 340 N.J. Super. 204, 216 (App. Div. 2001) (finding "the State's invited response" did not unfairly prejudice the defendant when it "did no more than balance the scales").

Here, defendant cites numerous and isolated portions of the prosecutor's opening remarks and summation that he claims improperly appealed to the jurors' emotions. First, he argues the State improperly appealed to the jurors' sympathy in its opening statement when: describing a witness, A.M.M., who was scared and hiding with her children during the crime; describing the victim's injuries after defendant ran him over with his car; and asking the jury to hold defendant responsible for his actions even though he suffered from mental illness.

Next, defendant cites numerous statements in summation he argues constitute prosecutorial misconduct: (1) over objection, describing the victim's difficulty breathing for nearly six months, during which time the victim's family suffered, wondering whether it would be his last day; (2) stating defendant caused the victim a "slow and agonizing death"; (3) describing A.M.M.'s being

A-2895-22

trapped in her car with her children and hoping not to be his next target; (4) describing N.A.'s terror defendant would "look his way"; and (5) using isolated words or phrases describing the "'horror" in which the victim was "crush[ed]," "burn[ed]," and "dragged" with "violent force," leaving a "grizzly scene" "of death and destruction," and "[t]he smell of flesh and blood . . . permeating the area." In addition, defendant emphasizes the below underlined comments, set forth in the full context of the State's discussion of his mental illness in its summation, which he contends "explicitly invited the jurors to reject [his] insanity defense based on their emotions and the nature of the crime":

> Bipolar disorder did not compel [defendant] to act . . . in a homicidal and violent manner. His anger, his aggression[,] and his rage did.
>
> Anger, aggression[,] and irritability [are] not defined by bipolar disorder. They are the defining characteristics of the antisocial personality that is . . . defendant. They define him. His life was replete with anger and aggression and we saw that in all of the medical records.
>
> And . . . <u>mental illness does not give a person a right to take another human being[']s life and to not be held accountable and responsible for it</u>.
>
> The story of . . . defendant's life[,] and the defense ha[ve] portrayed it as a tragedy[,] [d]<u>oes not give him the right to impose his tragedy on others</u>.
>
> . . . [D]efendant's genetic history, his erratic

upbringing[,] and his mental illness do not absolve him of criminal responsibility unless and until you decide that he did not know the nature and quality of his actions or that if he did[,] he did not know that it was wrong.

. . . .

. . . [The victim] did not deserve to die in a rage of fury, brought on by something as simple as the breakup of a three month relationship. . . .

[Defendant] knew what he had done. He acted knowingly, he acted purposely, and it was consciousness of guilt that made him run and flee in [a] car and on foot from the police officers that day, and the officers ended that chase on May 1[,] 2018.

And now he stands before you looking to be excused from criminal responsibility for the murder of another human being, and it's your job to end that chase and hold him criminally responsible, criminally accountable for what he had done, what he knows he did. He knew it was wrong and so do you.

We . . . told you that the facts should guide your verdict. They should guide your verdict, and that is a verdict of guilty on all seven counts.

[(Emphases added).]

We are unpersuaded the prosecutor's opening statement and summation were improper, inflammatory, or deprived defendant of a fair trial. The prosecutor was charged with the responsibility of vigorously representing the State's interest in law enforcement, see Williams, 244 N.J. at 607, and, in so

doing, had broad latitude in summation to draw conclusions and inferences from the evidence, see Bey II, 129 N.J. at 620. The State presented multiple witnesses to the assault, whose accounts it echoed in summation. The evidence discussed was supported by the State's factual presentation and did not distort the factual picture. See Geler, 358 N.J. Super. at 467.

Finally, except in one instance, the prosecutor's statements were not challenged by the defense when made and are therefore presumed to be nonprejudicial. See Timmendequas, 161 N.J. at 576. The prosecutor's statements here were not "so egregious as to deprive defendant of a fair trial." See Wakefield, 190 N.J. at 437. The defense's single objection related to a comment describing the victim's final six months of life spent struggling to survive, all of which was factually accurate. Moreover, the fact the crime here was particularly cruel and graphic does not make those facts inflammatory or irrelevant. Accordingly, we hold the challenged portions of the prosecutor's opening statement and summation did not constitute error requiring the reversal of defendant's conviction.

4.

Defendant further asserts the trial court committed reversible error in permitting the State "to improperly attack the defense expert with irrelevant and

misleading information about his compensation in unrelated matters." He argues the elicited testimony describing Dr. Saleh's compensation in an unrelated matter from 2013 was not relevant, was highly prejudicial, and improperly "undermined the defense's key witness." Defendant further contends the testimony was otherwise inadmissible as impermissible hearsay because it elicited compensation data from a 2016 Boston Globe article used to refresh Dr. Saleh's recollection. Defendant also asserts the court improperly "barred the defense from eliciting Dr. Saleh's compensation in this case" to rebut the State's assertion he was "paid an exorbitant amount" and improperly "instruct[ed] the jury, over objection, that it could consider Dr. Saleh's 2013 compensation when assessing his testimony."

Trial courts are afforded broad discretion in controlling cross-examinations. State v. Jenewicz, 193 N.J. 440, 467 (2008). We review a trial judge's rulings regarding cross-examination for abuse of discretion. Ibid. "[A]n abuse of discretion 'arises when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" State v. R.Y., 242 N.J. 48, 65 (2020) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)) (internal quotation marks omitted). We will "reverse only when the exercise of discretion was 'manifestly

unjust' under the circumstances." Newark Morning Ledger Co. v. N.J. Sports & Exposition Auth., 423 N.J. Super. 140, 174 (App. Div. 2011) (quoting Union Cnty. Improvement Auth. v. Artaki, LLC, 392 N.J. Super. 141, 149 (App. Div. 2007)).

"The proper standards of review of jury instructions are well-settled: if the party contesting the instruction fails to object to it at trial, the standard on appeal is one of plain error; if the party objects, the review is for harmless error." State v. Cooper, 256 N.J. 593, 607 (2024) (quoting Willner v. Vertical Reality, Inc., 235 N.J. 65, 80 (2018)). Initially, the parties agreed the jury charge for expert compensation was appropriate. Later, however, defense counsel arguably objected to the charge. Thus, our review is for harmless error, where we must find "some degree of possibility that [the error] led to an unjust result. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." State v. Amang, 481 N.J. Super. 355, 406 (App. Div. 2025) (alterations in original) (quoting State v. Baum, 244 N.J. 147, 159 (2016)).

The State cross-examined Dr. Saleh regarding his experience serving as an expert and the capacity in which he served, attempting to reveal his bias and to question his credibility and the weight of his opinions in response to his

statement on direct he had been retained as an expert "roughly" 250 times "by defense attorneys, . . . prosecutors, appointed by federal court judges[] and . . . as a guardian ad litem." When asked what percentage of his retainers were for the defense as opposed to the State, Dr. Saleh responded he did not know and it was not indicated on his curriculum vitae. That response led to the State's reference to an article from the <u>Boston Globe</u>, used to refresh Dr. Saleh's recollection, after which Dr. Saleh testified he believed he earned more than $452,000 in 2013 for his expert services, which were largely defense-related. Defense counsel objected, and the trial court denied the objection stating, "[c]ertainly his bias, his credibility, [and] the weight of his opinion" were proper inquiries on cross-examination. During the subsequent charge conference, the court summarized its reasoning for that prior decision:

> [I]t was clear from the questioning of . . . Dr. Saleh that he was being asked about his track record in terms of his issuing reports and his work primarily on the defense side and his compensation in those cases, which again, is a basis for which the jurors can certainly consider, not the amount of compensation, but the fact that he does or if the jury finds he does or does not primarily do defense work, whether he does have a bias or motivation. And that, again, has been recognized as [an] appropriate consideration for the jurors.
>
> And certainly Dr. Gilman was also asked about his compensation, was asked about what sides he has mostly worked for or . . . had been retained by, and he

answered appropriately.

> And, again, the model jury charges clearly show that there are . . . proper avenues of consideration for a jury in determining credibility, and in determining what weight to place on an expert's opinion.

> And, so for all those reasons[,] the [c]ourt does feel that it is appropriate[,] and . . . equally applicable to both experts.

Although defendant argues the trial court barred him from eliciting Dr. Saleh's compensation in this case in an attempt to minimize the impact of the jury hearing Dr. Saleh made over $450,000 in 2013 for his services, it does not appear Dr. Saleh was ever asked how much he was being compensated in this particular case. Rather, the only defense question the State objected to in this context was: "And you're staying at the very luxurious --." There was a brief inaudible sidebar, after which the court sustained the State's objection and the defense pivoted to questioning Dr. Saleh regarding the discovery he reviewed. We note, during an earlier charge conference, defense counsel stated she would typically elicit, on direct examination, the hourly rate her expert was paid, and the parties agreed that could be done through leading questions to avoid raising other collateral issues about rates paid by the public defender's office. Defense counsel later stated, during a subsequent charge conference, she had not been allowed to elicit Dr. Saleh's compensation in this case. However, the court noted

66

the issue had been discussed at sidebar and recalled it "g[a]ve the defense some leeway to make inquir[i]es . . to confirm with [Dr. Saleh] . . . []his compensation scheme." It explained it gave that leeway because "the [S]tate had, in fact, brought out all these statistics from other states" about Dr. Saleh's former compensation in other matters. In short, it does not appear defendant was precluded from asking Dr. Saleh about his compensation in this matter.

Thereafter, the trial court proceeded to instruct the jury on expert credibility and expert compensation, stating, in pertinent part:

> You are not bound by [the] experts' opinions, but you should consider each opinion and give it the weight to which you deem it is entitled, whether that be great or slight, or you may reject it. In examining each opinion, you may consider the reasons given for it, if any, and you may also consider the qualifications and credibility of the expert.
>
> . . . .
>
> The expert witnesses who testified, of course, are paid for their work. Experts are paid for their special knowledge, skill, experience, or training. Some may be full-time employees who receive a regular salary for their work. Some may be outside experts consulted for this particular case who receive a fixed or hourly fee. You may consider the compensation received by the expert witnesses as bearing on . . . their credibility. You should understand, however, that there is nothing improper in any expert receiving reasonable compensation for [their] work or . . . appearing in court.

If you find from the evidence that the amount of compensation received is unreasonable, or if you find from the evidence that the expert was paid simply to reach a particular result, you may consider whether . . . that affects the credibility, interest[,] or bias of the witness.

As always, you may give the opinion . . . such weight as you determine it deserves, consistent with the general rules of determining credibility.

Generally, "[t]he bases on which an expert relies when rendering an opinion are a valid subject of cross-examination." Jenewicz, 193 N.J. at 466. In fact, our Supreme Court "has long found the use of bias to attack a witness's credibility proper." State v. Scott, 229 N.J. 469, 481 (2017).

This idea was examined in State v. Smith, where the Court addressed the State's numerous references in its summation to the defendant's expert's "hefty" fees. 167 N.J. 158, 174 (2001). Noting "the State's expert witnesses are almost always unpaid," the Court "question[ed] the fairness of a jury instruction . . . that merely states that the amount of a defense expert witness' fee is a matter that a jury may consider as possibly affecting the credibility of the witness" because it "may tip the scales in favor of the credibility of the State's expert witnesses who, although unpaid, may have an equal or greater interest in the outcome" than a paid defense witness. Id. at 189. Thus, it found the State's references in summation constituted prosecutorial misconduct and reversed and

remanded for a new trial. Ibid. The Court held while the jury is permitted to consider the reasonableness of an expert's compensation as it relates to credibility and bias, the jury also needs to be guided by the principle that receiving a fee for services is not improper. Ibid. After Smith, an optional jury charge concerning expert compensation was approved, which was delivered to the jury in this case. See Model Jury Charges (Criminal), "Optional Charge Concerning Compensation of Experts" (approved Oct. 1, 2001).

This court faced an extreme example of a prosecutor's misuse of expert compensation in State v. Negron, 355 N.J. Super. 556 (App. Div. 2002). In Negron, the prosecutor vigorously cross-examined the defense experts on their fees "to impugn the[ir] integrity," and those persistent attacks continued in the State's summation. Id. at 564-75. We found "the line established in Smith was crossed" based on the prosecutor's "unsubtle and evidentially unsupported assertions that the experts had sold their integrity for their witness fees," which were "designed to prejudice the jury." Id. at 576; see also Smith, 167 N.J. at 178-81. We explained:

> [T]here is a difference, on the one hand, between
> commenting upon payment to an expert witness as a
> basis for presenting the jury with an argument of bias
> and, on the other hand, with nothing more than the
> payment itself, concentrating so much on that fact as to

> transform the argument into an independent collateral issue in the case.
>
> [Id. at 578 (citing Smith, 167 N.J. at 182-85).]

We further found the prosecutor's summation "was a catalog of prohibited defects which 'over-stepped the bounds of propriety and created a real danger of prejudice to the accused,'" id. at 577 (quoting Smith, 167 N.J. at 178), and "served to magnify and concentrate all the ensuing improprieties . . . that had already been perpetrated in cross-examination," ibid. Accordingly, we reversed and remanded for a new trial. Id. at 579.

Here, the parties first agreed a jury instruction on expert compensation was relevant and should be delivered to the jury. The State cross-examined Dr. Saleh appropriately in this regard. The prosecutor questioned Dr. Saleh regarding his past positional-leaning when serving as an expert. The State also asked if Dr. Saleh recalled making $452,000 in 2013, to which Dr. Saleh responded, "I thought it was a little bit more than that, but that sounds right." He also acknowledged, "at least in that year," his expert work "was predominantly for the defense." Dr. Saleh further admitted to this figure even before being questioned about the Boston Globe article. The questioning was designed to demonstrate Dr. Saleh made a significant amount of money from serving as a defense expert and reveal his purported bias as a defense expert, it

was not offered to suggest to the jury Dr. Saleh fabricated testimony for a fee, unlike the prosecutor's suggestion in Negron. See 355 N.J. Super. 571, 577. Thus, we discern no error by the trial court in allowing that cross-examination.

To the extent defendant argues the trial court's decision to prohibit Dr. Saleh from testifying as to the compensation he earned in this case was prejudicial, we find both experts were treated equally in that regard. First, it is not clear from the record defendant was prohibited from questioning Dr. Saleh regarding how much he earned in this case. Moreover, defendant was not prohibited from questioning Dr. Gilman regarding his prior earnings. There was no argument regarding the amount either expert earned in this case that would lead the jury to believe Dr. Saleh fabricated his testimony for a fee any more than Dr. Gilman. The State raised Dr. Saleh's prior earnings as a defense expert to demonstrate his bias, not for the proposition his opinion was for sale. Accordingly, we find no misuse of the court's discretion in permitting the cross-examination of Dr. Saleh in that manner.

Likewise, we discern no error in the trial court's jury instruction on expert compensation.[6] The charge mimicked the language of Model Jury Charges

---

[6] "We must assume the jury followed the court's instruction." State v. Little, 296 N.J. Super. 573, 580 (App. Div. 1997).

A-2895-22

(Criminal), "Optional Charge Concerning Compensation of Experts," and it properly instructed the jury it could consider the experts' compensation as "bearing on . . . their credibility." Accordingly, we conclude there was no error in the jury charge warranting reversal.

B.

Defendant argues the trial court erred in failing to suppress an unrecorded and un-Mirandized statement he made to a responding officer because he was "in custody" when questioned, "without being advised of his rights," in the presence of five officers, while only partially dressed and seated outside of his apartment. Specifically, he refers to the statement he made to the arresting officer in which he "allegedly claimed to drive a truck, rather than the Malibu involved in the crime." He also argues the trial court erred in failing to suppress a second recorded statement he made to lead detectives while in custody because "the State failed to prove that he validly waived his rights beyond a reasonable doubt despite his mental illness." Defendant claims these errors require the reversal of his convictions.

At the suppression hearing, defendant sought to suppress testimony from Officer Wagner, the responding officer who first engaged with him after the assault. Officer Wagner testified he and four other officers responded to a

dispatch seeking to locate a blue Kia around the Winding Wood apartment complex that was "possibly involved in an aggravated assault with a vehicle." He explained when he arrived at the apartment complex, he was "flagged down" by a woman who he later identified as defendant's mother. Officer Wagner recalled defendant's mother was "frantically yelling" her address and "that her son ran in the house with no shirt on, and started screaming at her to get off the f[***]ing phone," and "stated her son has bipolar disorder, and tends to get[] violent so she was scared and ran out of the apartment."

Officer Wagner knocked on the door of the apartment, and defendant answered, identifying himself. Officer Wagner asked him to sit on the porch steps, and he described defendant as "cooperative and responsive" during that time. He asked defendant if he was involved in a motor vehicle accident, and defendant responded, "I don't know." Officer Wagner also asked defendant "what kind of car he drives," to which defendant stated, "a pickup truck," but he did not know the make or model or where he parked it. At that point, Officer Wagner received instructions to detain defendant because the Freehold Police Department "would be coming to retrieve him to place him under arrest." Defendant was handcuffed, placed in the backseat of a patrol car, and transported to the Sayreville police station.

Meanwhile, Detective Raynor responded to the crime scene in Freehold, indicating he had been advised of "some sort of aggravated assault" occurring on Harding Road. Through his investigation, he learned defendant "had ties to . . . the Chevy Malibu" left behind at the crime scene and the Sayreville police had taken him into custody. Detective Raynor asked for defendant to be transported directly to the Monmouth County Prosecutor's Office, where he was placed in a holding cell. Defendant later asked to speak with a detective, at which point he was moved to an interview room.

In the interview room, Detective Raynor read defendant his Miranda rights. Defendant sought clarification of those rights, which Detective Raynor provided. Defendant then signed a Miranda rights form and initialed each of the five questions contained therein, acknowledging he had been advised of the rights, understood them, and wished to waive those rights and speak with the detectives. Detective Raynor testified the interview proceeded in a "calm" and "conversational" manner. During the approximately one-hour interview, defendant described the assault.

Subsequently, defendant sought suppression of his statements to Officer Wagner, arguing no Miranda warnings were given to him, and defendant, "as any reasonable person would have[,] believed that he was not free to leave, [and]

that he either was in custody or was about to be in custody" and handcuffed. Defendant also sought suppression of the interview with Detective Raynor because his Miranda waiver was not made intelligently or knowingly, pointing to his psychiatric history and various behaviors that day.

The trial court denied defendant's motion to suppress, allowing the State to use both statements. First, it found defendant was not in custody when he made the first statement to Officer Wagner at his home. The court explained Officer Wagner's questions at that time were "investigatory in nature," given the officer knew "very little" about what had occurred in Freehold, other than the fact two vehicles had been involved.

Regarding defendant's second recorded statement in the interview room at the Monmouth County Prosecutor's Office after he was Mirandized, the trial court found defendant "affected both an oral and written waiver of his Miranda rights." The court reasoned: "defendant's statements were certainly not the result of police coercion"; "the waiver was not, in fact, a product of defendant's mental illness"; defendant "knowingly and voluntarily provide[d] that statement," noting defendant was "found competent to proceed in this matter" and "assist in his own defense," as well as his prior experience with the criminal justice system; and defendant's refusal to give the detectives consent to search

75

his cell phone "demonstrate[d] his sense of agency and awareness of his rights during the interview."

In support of its decision, the trial court made numerous observations regarding defendant's calm demeanor during the interview, the voluntary nature of his statement, his clear recollection of the events, his awareness of his and others' feelings, his awareness of his actions, his awareness of the potential charges to be filed against him and why the police were "coming to get him," and his ability to comprehend time and place.

"[W]e review de novo the suppression of an incriminating statement under the Fifth Amendment to the United States Constitution and this state's common law . . . ." State v. Tiwana, 256 N.J. 33, 40-41 (2023). However, we "accord deference to the trial court's factual findings" and affirm the grant or denial of a motion to suppress when the decision is supported by credible record evidence. Id. at 40; see also State v. Erazo, 254 N.J. 277, 297 (2023) (quoting State v. Hreha, 217 N.J. 368, 381-82 (2014)) ("With respect to the trial court's admission of police-obtained statements, . . . an appellate court 'should engage in a "searching and critical" review of the record to ensure protection of a defendant's constitutional rights.'").

"The Fifth Amendment to the United States Constitution establishes that

'[n]o person . . . shall be compelled in any criminal case to be a witness against himself.'" M.A. v. J.H.M., 260 N.J. 522, 533 (2025) (omission in original) (quoting U.S. Const. amend. V). Although the New Jersey Constitution does not contain a parallel provision, "the privilege is firmly established in this state's common law and is codified in statute and in the Rules of Evidence." State v. Knight, 256 N.J. 404, 417 (2024) (first citing N.J.S.A. 2A:84A-19; and then citing N.J.R.E. 503).

"The United States Supreme Court clarified the Fifth Amendment right against self-incrimination in Miranda by establishing safeguards 'to protect a suspect's right against self-incrimination from the psychological pressures inherent in a police-dominated atmosphere that might compel a person "to speak where [they] would not otherwise do so freely."'" Tiwana, 256 N.J. at 41 (quoting State v. L.H., 239 N.J. 22, 41-42 (2019)). The Miranda warnings were thus established to combat these pressures. Ibid. "The failure to administer Miranda warnings prior to a custodial interrogation 'creates a presumption of compulsion,' and any unwarned statements must be suppressed -- even when they 'are otherwise voluntary within the meaning of the Fifth Amendment.'" Ibid. (quoting Oregon v. Elstad, 470 U.S. 298, 307 (1985)).

"Still, the privilege is not absolute." M.A., 260 N.J. at 533. "Miranda is

triggered only when a person is in custody and subject to questioning by law enforcement." State v. Ahmad, 246 N.J. 592, 610 (2021). Thus, "'[c]ustody' for the purposes of Miranda requires a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" Erazo, 254 N.J. at 298 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). "In determining whether the defendant would have felt free to leave, the court should consider the nature and degree of pressure applied to detain the suspect, the duration of the questioning, the physical surroundings, and the language used by police." Timmendequas, 161 N.J. at 614. It is not "dispositive whether police consider someone a 'suspect,' 'person of interest,' or 'witness.'" Erazo, 254 N.J. at 299.

Our Supreme Court clarified "custody in the Miranda sense does not . . . 'require physical restraint in a police station, []or the application of handcuffs, and may occur in a suspect's home or a public place other than a police station.'" Ahmad, 246 N.J. at 610-11 (quoting State v. P.Z., 152 N.J. 86, 103 (1997)). Rather, "[t]he critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors." Id. at 611

(quoting P.Z., 152 N.J. at 103); see also Erazo, 254 N.J. at 298. "The inquiry is an objective one, determined by 'how a reasonable [person] in the suspect's position would have understood [their] situation.'" Ibid. (first alteration in original) (quoting State v. Hubbard, 222 N.J. 249, 267 (2015)).

For example, in State v. Bullock, the Court found the defendant was "in custody" when he was escorted into a campus courtyard from his residence hall after they confirmed his identity. 253 N.J. 512, 538 (2023). In the courtyard, "three uniformed, armed officers surround[ed] [the] defendant" and asked him questions about the alleged crimes. Ibid. The Court reasoned the defendant was in custody at that point because his "freedom of movement was limited," noting "[i]t [wa]s hard to imagine that a reasonable person in [the] defendant's position would have felt free to leave under those circumstances." Ibid.

The Court has qualified, however, "[i]f the questioning is simply part of an investigation and is not targeted at the individual because [they are] a suspect, the rights provided by Miranda are not implicated." Timmendequas, 161 N.J. at 614-15. In Timmendequas, a young girl went missing and the police began investigating by questioning her neighbors, including the defendant. Id. at 537. The defendant's roommate gave the police consent to search their home, during which the police interviewed the defendant, who was described as "shaking and

perspiring heavily throughout the course of the interview." Id. at 539. That "non-custodial" home interview led to his later confession at the police station, by which time he had already received his Miranda warnings and waived those rights. Id. at 539-41. The defendant later argued his initial statements in his home were "custodial," and "[t]herefore, the officers should have administered Miranda warnings." Id. at 605. The Court disagreed, finding the defendant's initial interrogation at his home was not custodial because: the interview was "not lengthy in duration"; the defendant was "not restrained in any way"; the location of the questioning was "not inherently intimidating," given it "took place in [the] defendant's home" and "not in a police station"; the defendant was permitted to drive his own car to the police station, indicating he was "free to leave"; and there was no evidence the defendant was a suspect at that point. Id. at 615.

Here, we conclude the trial court did not err in declining to suppress defendant's statements to the Sayreville police he made while being questioned at his doorstep. The court's factual findings were supported by the credible evidence in the record. The circumstances surrounding this investigatory questioning fail to demonstrate a coercive atmosphere or a restraint on freedom necessary to find a custodial interrogation. As the court noted, Officer Wagner

knew "very little" about what had occurred in Freehold at the time defendant was briefly questioned on his front porch. Additionally, the police never entered his home. While Officer Wagner did request defendant "step outside and have a seat on the step," he described the atmosphere as "[v]ery calm," "[v]ery informal," and "[l]aid back." Although other officers were dispatched to the apartment complex, only Officer Wagner questioned him, and defendant was not handcuffed during that time. The questions were neither threatening nor numerous, amounting to inquiries to confirm his identity and whether "he was involved in a motor vehicle accident, . . . what kind of car he had, . . . [and] if he knew where he parked [his] car." In addition, the questioning was not lengthy. Moreover, it was not until after the brief questioning that dispatch directed Officer Wagner to detain defendant.

Defendant also argues the trial court erred in failing to suppress his recorded statement made at the Monmouth County Prosecutor's Office because, due to his mental illness, there could be no valid waiver of his rights. When in custody, a defendant's statement must be voluntary and made after a valid and knowing waiver of Miranda rights. State v. Presha, 163 N.J. 304, 313 (2000). "The Miranda Court held that, after an individual is given Miranda warnings and apprised of the rights, that person 'may waive effectuation of [those] rights,

provided the waiver is made voluntarily, knowingly[,] and intelligently.'" Bullock, 253 N.J. at 533-34 (first alteration in original) (quoting Miranda, 384 U.S. at 444). "[T]he State [must] 'prove the voluntariness of a confession beyond a reasonable doubt.'" L.H., 239 N.J. at 27 (quoting State v. Galloway, 133 N.J. 631, 654 (1993)); see also State v. Rivas, 251 N.J. 132, 154 (2022). "The voluntariness determination weighs the coercive psychological pressures brought to bear on an individual to speak against [their] power to resist confessing." Id. at 43. "[F]actors relevant to the voluntariness analysis include 'the suspect's age, education and intelligence, advice concerning constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment and mental exhaustion were involved,' as well as previous encounters with law enforcement." Ibid. (quoting Hreha, 217 N.J. at 383). "The ultimate determination of voluntariness, however, will depend on the totality of the circumstances." Ibid.

Defendant relies upon State v. Burney, 471 N.J. Super. 297 (App. Div. 2022), rev'd on other grounds, 255 N.J. 1 (2023), in support of his claim his "mental illness posed a significant barrier to the State's ability to prove that his waiver was valid beyond a reasonable doubt." In Burney, the defendant "was in an intensive care unit awaiting overdue dialysis" when he was interrogated by

82

the police.  Id. at 305.  The police "verbally administered Miranda warnings" to the defendant before questioning him, although this court found the defendant was not properly advised of those rights.  Id. at 311.  Noting the defendant's medical chart indicated he suffered from "toxic/metabolic derangement," we remanded for the parties to present expert medical testimony to uncover "the impact of that condition on the voluntariness of [the] defendant's statements to police."  Id. at 305, 318.  We held "the State shall bear the burden to present expert medical testimony concerning [the] defendant's condition at the time of the interrogation," instructing the trial court to "make findings of fact concerning that medical condition and [to] reevaluate the totality of relevant circumstances bearing on voluntariness, accounting for [the] defendant's physical and mental condition."  Id. at 318.

However, Burney does not stand for the proposition a defendant's mental illness supports a per se inference of an invalid Miranda waiver.  Rather, our Supreme Court instructs, "[o]nly in the most limited circumstances have we applied a per se rule to decide whether a defendant knowingly and voluntarily waived Miranda rights."  State v. Sims, 250 N.J. 189, 211-12 (2022) (quoting State v. Nyhammer, 197 N.J. 383, 403 (2009)).  Indeed, this court has found "[t]he fact that [a] defendant was suffering from a mental illness at the time of

the questioning did not render [their] waiver or . . . statement involuntary." State v. Smith, 307 N.J. Super. 1, 10 (App. Div. 1997). Rather, the "voluntariness" of a Miranda waiver is determined by examining whether the statement was "the product of a free and deliberate choice rather than intimidation, coercion[,] or deception" by the police. Id. at 11. In this circumstance, we find State v. Glover, 230 N.J. Super. 333 (App. Div. 1988), more helpful.

In Glover, the defendant set his next-door neighbor's home on fire and, as the family exited their burning home, he "killed the head of the household" with a shotgun. Id. at 337. The defendant suffered from long-standing mental illness, diagnosed as paranoid schizophrenia, and had a history of violent conduct that previously resulted in his confinement and psychiatric care. Id. at 337, 339. Yet, this court held the defendant's waiver of his Miranda rights was voluntary, reasoning:

> [The d]efendant when apprehended acted and appeared normal. He acknowledged that he understood his rights and was willing to waive them. . . . [T]here is no evidence that [the] defendant was not rational or acting in an intelligent manner or that he was unable to exercise his free will in waiving his rights and confessing to his crimes. . . . [T]he record clearly demonstrates that [the] defendant's ability to make free and rational choices when interrogated by the police was not "overborne by [the] defendant's severe mental illness." [The d]efendant was given all of his Miranda rights numerous times in detail and acknowledged each

time that he understood those rights. Further, he was able to state in detail what he desired, including his specific requests for certain food and drink.

[Id. at 342.]

Here, the trial court made similar factual conclusions after reviewing the video evidence of defendant's custodial interview with Detective Raynor. It found defendant "remained calm and composed" and the interview was "cordial and conversational," none of which are the hallmarks of police coercion. The court also noted there was no expert testimony regarding "defendant's state of mind at the time of the waiver" to support his claim the waiver was invalid due to his mental illness. Thus, considering the "totality of the circumstances," it observed defendant's waiver was voluntary because he: was "found competent to proceed in this matter"; "had prior involvement with the criminal justice system"; "affected both an oral and written waiver of his Miranda rights"; and demonstrated an understanding of those rights when he refused to give the police consent to search his cell phone. The court further noted, "[d]efendant was able to state when he did not understand his rights, asking Detective Raynor to repeat a portion of the Miranda warning and then afterwards stated that he understood."

The trial court also considered "defendant's demeanor during the interview" as an indicator of his "state of mind," which it described as "calm"

and "not fidgeting" or "nervous[]," noting "he felt free to ask questions . . . when he did not understand." Defendant "was able to state with specificity where he spent the night, and why he spent the night in his car." He corrected misstatements made by the officers and remembered when a question was already asked of him. Defendant "also indicated awareness of his own feelings[] and . . . emotional state at the time," stating, "today I'm good. Today I'm calm." The court concluded defendant had "complete awareness of his actions" given his statements, "I tried to kill him" and "I intended to kill him," noting he explained the events "very calmly" and without appearing confused. Finally, the court noted defendant had "clear awareness of [the] situation in which he found himself . . . and why the police were coming to get him."

We affirm substantially for the reasons set forth by the trial court and add the following. The Court's logic in Erazo applies with equal force here: "Defendant was an adult. He could read and write. Other than his brief mention of a purported history of [mental illness], there is nothing in the record to suggest that defendant did not know what [the detective] meant when he [read him his Miranda rights.]" See 254 N.J. at 303. The record clearly demonstrates defendant's ability to make free and rational choices during the interrogation was not overborne by his mental illness. In short, we discern no error in the trial

86

court's finding defendant's waiver was "knowing and voluntary" and conclude the court correctly denied the motion to suppress.

C.

Defendant further argues the trial court improperly removed Juror 14 without cause, when a curative instruction would have sufficed, and failed to voir dire the remaining jurors to guard against contamination, depriving him of his rights to due process and a fair trial and requiring the reversal of his convictions. Defendant also claims the court erred in failing to excuse Juror 7, who brought a courtroom Bible into the deliberation room, which he argues had the capacity to taint deliberations as an "external influence."

During the fourteenth day of trial, Juror 14 submitted the following note:

> Your Honor,
>
> I woke up this morning with two questions coming to mind. Can you explain to us why the following information is being withheld.
>
> 1. Why have you sustained objections regarding the cost of the injectable medications, weeks[,] or months before the incident? Did [defendant] have a health care plan? Why would this be withheld?
>
> 2. According to the defense psychiatrist, [defendant] was provided medication a week after the incident. Since he is in custody this means the [S]tate had him evaluated. Seems odd neither the defense nor the [S]tate would want the jury to hear about it[.] Why

> haven't we heard about the [S]tate's psychiatrist['s] report?

The trial court determined Juror 14 needed to be removed from the jury because the questions "reflect[ed] the juror's speculation and questioning," which was contrary to the court's instructions and indicated the juror's unwillingness or inability to follow curative instruction, if given. It noted the jurors had been advised to not "speculate as to what . . . information may [have] be[en]" when it ruled on certain objections. The court explained:

> [The court is] not persuaded[,] giv[en] the tone . . . of these questions, including . . . the use of the word "withheld," as well as some of the [e]mbedded conclusions[,] . . . that the juror would, in fact, be able to follow [the court's] instructions, and not engage in that speculation . . . and, perhaps, even contrary to [the court's] instructions[,] use that speculation[,] . . . or surmise some information that has not been provided[,] . . . as part of [their] considerations in, again, weighing the evidence, which would be inappropriate and improper.
>
> Certainly, we're at the stage here where that potential -- and . . . us[ing] the term bias loosely, not using it in the context of an actual bias, but a predisposition or a pre-judgment or perhaps . . . having already formed an opinion to some extent can be addressed here, and avoid potential taint in the deliberation rooms by excusing the juror, and certainly the cases guide the [c]ourt that if . . . there is any suggestion, really, that there is a potential that a juror's impartiality is, in any way, compromised that the [c]ourt should err on the side caution. And, again, in

this case, the excusal of the juror would not compromise the trial. We do have another alternate. We do expect that we are at the end of the case and, so, certainly, again, out of an abundance of caution for all the concerns that were raised by the [S]tate, but . . . also the [c]ourt concurs, [the court is] going to excuse the juror.

A second juror issue subsequently arose during deliberations. Juror 7 took a courtroom Bible into the jury room on the second day of deliberations for approximately thirty minutes. Finding no binding caselaw on point, but reviewing cases from other jurisdictions analyzing the presence of Bibles in jury rooms, the trial court found "no per se rule that would strictly prohibit the presence of a Bible as long as it did not cause an undue influence or . . . was improperly considered by the jurors." The court therefore declined to excuse Juror 7 and opted to question him individually to evaluate whether the presence of the Bible had the capacity to influence deliberations. Juror 7 ultimately remained on the panel.

"Case law instructs that '[a]n appellate court reviews the trial court's jury-related decisions under the abuse of discretion standard.'" State v. Silvers, 477 N.J. Super. 228, 244 (App. Div. 2023), certif. denied, 256 N.J. 197 (2024) (alteration in original) (quoting State v. Brown, 442 N.J. Super. 154, 182 (App. Div. 2015)). "[T]he trial court is in the best position to determine whether the

jury has been tainted."  State v. R.D., 169 N.J. 551, 559 (2001).  Indeed, a trial judge has broad discretion in deciding whether a particular juror's continued presence would taint a defendant's constitutional right to an impartial jury.  Id. at 559-61.  This standard "respects the trial court's unique perspective" while showing traditional deference to the court in "exercising control over matters pertaining to the jury."  Id. at 560-61.

The court's authority to discharge a juror is governed by Rule 1:8-2(d)(1), which seeks to "delicately balance[] two important goals:  judicial economy and the right to a fair jury trial."  State v. Jenkins, 182 N.J. 112, 124 (2004).  As such, Rule 1:8-2(d)(1) permits the court to discharge a juror during trial but before deliberations for "good cause."  Id. at 123.  Specifically, in pertinent part, it provides:

> All the jurors shall sit and hear the case, but the court for good cause shown may excuse any of them from service provided the number of jurors is not reduced to less than [twelve] or [six] as the case may be or such other number as may be stipulated to.
>
> [R. 1:8-2(d)(1).]

As our Supreme Court has explained:

> Under the Rule, a juror may be discharged for "good cause" before deliberations begin.  Until that point, the panel ordinarily exceeds twelve jurors, and the removal of a juror reduces by one the number of alternates to be

A-2895-22

chosen at the end of the case. However, once the case has been submitted to the twelve jurors chosen to decide guilt or innocence, a deliberating juror may be replaced with an alternate juror only in specifically defined circumstances.

[Jenkins, 182 N.J. at 123-24.]

Thus, discharge of a juror after the jury begins deliberations is more restricted. Rule 1:8-2(d)(1) instructs "an alternate juror may not be substituted unless 'a juror dies or is discharged by the court because of illness or other inability to continue.'" State v. Musa, 222 N.J. 554, 565 (2015) (quoting Rule 1:8-2(d)(1)). The Court cautioned the phrase "inability to continue" found in Rule 1:8-2(d)(1) should be "restrictively interpreted," id. at 566, and "juror substitution 'should be invoked only as a last resort,'" Jenkins, 182 N.J. at 126 (quoting State v. Hightower, 146 N.J. 239, 254 (1996)). Accordingly, the Court has "delineate[d] the circumstances in which juror substitution will not undermine the sanctity of the jury's deliberative process," chiefly permitting dismissal when the condition for dismissal is personal to that juror, like death or illness. Jenkins, 182 N.J. at 124. "On the other hand, the 'inability to continue' standard is necessarily vague because it is impossible to catalogue the myriad circumstances personal to a deliberating juror that may warrant [their] removal and substitution." Ibid.

Indeed, "[n]o juror has the right to disregard a court's instructions, that is, to engage in nullification." Id. at 128. Thus, jurors who "cannot obey [their] oath, follow the law, and render fair and impartial justice cannot remain on the jury." Ibid. The Jenkins Court held "a juror who expressly states that [they] cannot be impartial or . . . [are] controlled by an irrepressible bias, and therefore will not be controlled by the law, is unable to continue as a juror for purposes of Rule 1:8-2(d)(1), and must be removed from a jury." Ibid.

If during the course of a trial there are allegations a juror may have been exposed to outside influences, "the trial court must act swiftly to overcome any potential bias and to expose factors impinging on the juror's impartiality." R.D., 169 N.J. at 557-58. The judge "is obliged to interrogate the juror" believed to be influenced and "determine if there is a taint." Id. at 558. When questioning a juror allegedly possessing extraneous information, the court should inquire as to the nature of that information and whether the juror has, intentionally or not, imparted it to other jurors. Id. at 560. Depending on the juror's answers, the court must then decide whether to "voir dire individually other jurors to ensure the impartiality of the jury." Ibid. That decision is discretionary, and there is "no per se rule" requiring individual voir dire of additional jurors in all instances of potential jury taint. Id. at 561.

We discern no abuse of discretion in the trial court's dismissal of Juror 14 prior to deliberations. The court thoroughly evaluated the juror's written questions and concluded the juror was disregarding the court's instructions and formulating premature conclusions. When privately addressed, Juror 14 stated he did not discuss his questions with any of the other jurors, allowing the court to conclude the issue was purely personal to Juror 14 and not one that threatened the integrity of the entire jury or tainted the other jurors' ability to engage in an open-minded discussion during deliberations.

Consistent with R.D., the trial court explained, on the record, its reasons for declining to individually interview the other jurors. See 169 N.J. at 560-61. It considered questioning the remaining jurors but concluded:

> Further voir dire of the entire panel without cause to believe that [Juror 14] had shared the questions and concerns with the jurors could certainly, as the [c]ourt indicated at the time[,] pose a risk of tainting the jury or planting seeds in the jurors['] minds, again, inviting impermissible speculation as to [Juror 14] [them]self, as to the process, or as to the deliberative process, and the [c]ourts are instructed to be sensitive to any interference with the deliberative process.

In R.D., the Court cautioned, "[i]n some instances, the court may find that it would be more harmful to voir dire the remaining jurors because, in asking questions, inappropriate information could be imparted." 169 N.J. at 561.

Accordingly, we determine the trial court appropriately exercised its discretion under R.D., and its excusal of Juror 14 was not made in error, as it did not compromise the trial given an alternate was available and deliberation had not yet begun. See id. at 560-61.

We also discern no misapplication of discretion in the trial court's decision not to excuse Juror 7 for bringing a courtroom Bible into deliberations. Defendant does not cite to any New Jersey caselaw demonstrating the presence of a Bible in the jury deliberations room "posed a clear risk" of improperly influencing the jury. However, in the circuit court cases defendant cites, the courts addressed fact patterns where the Bible was "used" in jury deliberations, not just present for a juror's own personal inspiration during the deliberation process. See, e.g., Oliver v. Quarterman, 541 F.3d 329, 339 (5th Cir. 2008) ("This analysis persuades us that when a juror brings a Bible into the deliberations and points out to [their] fellow jurors specific passages that describe the very facts at issue in the case, the juror has crossed an important line."); United States v. Lara-Ramirez, 519 F.3d 76, 86 (1st Cir. 2008) (where a juror brought a Bible into the jury room during deliberations stating they wanted the other jurors to "hear the facts, but also consider what God says in the Bible"); McNair v. Campbell, 416 F.3d 1291, 1308 (11th Cir. 2005) (where the foreman

94

read aloud two Bible passages and conducted prayer in the jury room during deliberations); <u>Robinson v. Polk</u>, 438 F.3d 350, 363-64 (4th Cir. 2006) (holding "the physical presence and reading of the Bible in the jury room" did not improperly influence the jury); <u>United States v. Rodriguez</u>, 675 F.3d 48, 60-61 (1st Cir. 2012) (distinguishing <u>Lara-Ramirez</u>, 519 F.3d at 86, the court found no error when the district court was only questioning the foreperson about the presence of a Bible in the jury room, and the Bible did not come up in deliberations).

Here, the trial court appropriately investigated the impact the courtroom Bible's presence may have had on the jury amidst deliberations. The court found the deliberative process had not been compromised, which was supported by its finding the Bible was only in the jury room for a short period and Juror 7's statement it was not used during deliberations and he simply held it for comfort. Indeed, it was the same Bible that was sitting on the jury rail all throughout the trial. Because a juror should only be removed as a last resort once deliberations have begun, we conclude the court did not err in finding there was no evidence demonstrating undue influence or impropriety during deliberations due to the Bible's presence in the jury room. <u>See</u> <u>Jenkins</u>, 182 N.J. at 126.

D.

Defendant asserts the trial court's failure to adequately record "at least 262 inaudible sidebars" makes it "impossible to fully understand the [trial] proceedings" and properly raise all viable issues on appeal, violating his due process rights and requiring a new trial. Specifically, defendant identifies: "(1) thirty-seven [sidebars] where the court overruled a defense objection; (2) eighteen where the defense objected without a clear ruling; (3) thirty-eight where the court sustained a State objection, and another two where the outcome was unclear; and (4) dozens where there is no indication of what was discussed or resolved, or sometimes of even who initiated the sidebar."

Pursuant to Rule 1:2-2, all trial court proceedings "shall be recorded verbatim except, unless the court otherwise orders, settlement conferences, case management conferences, calendar calls, and ex parte motions." In State v. Paduani, this court recognized, "where a defendant contends that error was made in an unrecorded sidebar conference, prejudice may result from our inability to review the alleged error." 307 N.J. Super. 134, 143 (App. Div. 1998). Accordingly,

> great care must be exercised by the trial judge to assure preservation of a verbatim recording of the proceedings required by R[ule] 1:2-2 and R[ule] 2:5-3(a). The complete transcript is of crucial importance for a

meaningful review to both the appellate court and to new counsel on appeal. All side bar conferences which pertain in any way to the trial or the conduct thereof must be "on the record" and a verbatim recording made. In the event a side bar conference occurs which does not in any way involve the trial then underway, a verbatim recording would be unnecessary. However, to dispel all doubts concerning the silent record, which only notes a "side bar conference off the record," a statement should be made on the record indicating that the conference concerned matters other than the pending litigation.

[State v. Green, 129 N.J. Super. 157, 166 (App. Div. 1974) (citations omitted).]

Not every failure to comply "constitutes a per se basis for reversal." Paduani, 307 N.J. Super. at 141. The error "shall be disregarded . . . unless it is of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. "The absence of a verbatim record merely raises a question of fairness that must be addressed. It does not render a trial unfair." State v. Bishop, 350 N.J. Super. 335, 347 (App. Div. 2002) (citation omitted).

More importantly, "it is not the sole responsibility of the trial judge to reconstruct the record." Id. at 348. "Instead, reconstruction of the record is a 'participatory process' involving the court and counsel." Ibid. (quoting State v. Casimono, 298 N.J. Super. 22, 25 (App. Div. 1997)). Rule 2:5-3(f) requires an appellant to "settle the statement of the proceedings" when no verbatim record

is available:

> If a verbatim record made of the proceedings has been lost, destroyed[,] or is otherwise unavailable, the court or agency from which the appeal was taken shall supervise the reconstruction of the record. The reconstruction may be in the form of a statement of proceedings in lieu of a transcript.
>
> [R. 2:5-3(f).]

A "defendant also has a duty to attempt to reconstruct the record." Bishop, 350 N.J. Super. at 348. A defendant's failure to reasonably attempt to reconstruct the record, as occurred here, precludes them from alleging reversible error. See Paduani, 307 N.J. Super. at 142; Pressler & Verniero, Current N.J. Court Rules, cmt. 3.1 on R. 1:2-2 (2026).

Here, defendant contends the trial court failed to record numerous sidebar conferences, and therefore, the record is "too deficient for [him] to fully pursue his direct appeal." We are unconvinced by this argument. First, at the outset of the hearings, on March 29, 2021, the court noted, "for completeness of the record, . . . [regarding] the substance of the discussion at sidebar[,] . . . unfortunately, . . . this courtroom does not have a microphone. So, I wanted to make sure the record reflected that." Knowing the courtroom was not equipped with microphones to record sidebars, defense counsel should have been better prepared to settle the record for appeal; however, no effort was made under Rule

2:5-3(f).  Defendant is now precluded from using this issue to allege reversible error on appeal.

E.

Defendant contends the cumulative effect of the errors cited in his prior points casts doubt on the propriety of the jury verdict and requires a new trial.

The cumulative error doctrine provides reversal is warranted when a combination of errors "casts doubt on the propriety of the jury verdict" and "prejudice[s] the fairness of [a] defendant's trial."  Jenewicz, 193 N.J. at 474.  A defendant is not entitled to a perfect trial but is entitled to a fair one, and where multiple errors collectively undermine fairness, a new trial will be required.  Marshall, 123 N.J. at 169-70.  As our Supreme Court stated in State v. Reddish, "[w]e have recognized that although an error or series of errors might not individually amount to plain error, in combination they can cast sufficient doubt upon the verdict to warrant reversal."  181 N.J. 553, 615 (2004).  Conversely, "the theory of cumulative error will still not apply where no error was prejudicial and the trial was fair."  State v. T.J.M., 220 N.J. 220, 238 (2015) (quoting State v. Weaver, 219 N.J. 131, 155 (2014)).

For reasons we have explained, we are unpersuaded any prejudicial errors were committed on an individual or cumulative basis.  Accordingly, we

conclude defendant has failed to establish he was deprived of the right to a fair trial.

F.

Defendant argues "[r]esentencing is required because the [trial] court erred in weighing the sentencing factors, in deciding to impose three consecutive sentences, and in finding [him] extended-term eligible."  We vacate defendant's sentence and remand for resentencing consistent with State v. Torres, 246 N.J. 246 (2021), and State v. Carlton, 262 N.J. 629 (2026).

1. Aggravating and Mitigating Factors.

Defendant argues "[t]he [trial] court improperly found and weighed multiple aggravating and mitigating factors."  First, he argues its "use of the deferred disposition was . . . improper" because prior dismissed charges may not be considered for any purpose.  Second, defendant claims the court "erred in affording aggravating factor six heavy weight" based on the nature and seriousness of the offense because only his prior criminal record was relevant.  Next, he claims it "gave too little weight to mitigating factor four" because events "triggering" his conduct should not have played a role at sentencing.  Finally, defendant argues the court wrongfully afforded factor fourteen only "moderate" weight in assessing whether his crimes resulted from "youthful

100

missteps," rather than strictly focusing on his age.

In considering the length of defendant's sentence, the trial court found aggravating factors[7] one, two, three, six, nine, and thirteen applicable, affording each a heavy weight, except for factor thirteen, which it assigned a moderate weight. As for mitigating factors,[8] it found factors four and fourteen applicable, respectively assigning them a light and moderate weight. Ultimately, the court found "the aggravating factors not only preponderate[d], but substantially outweigh[ed] th[e] mitigating factors" and used that finding in support of its decision to sentence defendant in the aggregate to a life sentence plus thirty-five years of imprisonment, subject to NERA.

"Appellate review of sentencing decisions is relatively narrow and is governed by an abuse of discretion standard." State v. Blackmon, 202 N.J. 283, 297 (2010). A trial court enjoys "considerable discretion in sentencing." State v. Blann, 429 N.J. Super. 220, 226 (App. Div. 2013). An appellate court must review whether the sentencing court followed the applicable sentencing guidelines. State v. Natale, 184 N.J. 458, 489 (2005).

"[S]entencing is a holistic endeavor." Torres, 246 N.J. at 272. The

---

[7] See N.J.S.A. 2C:44-1(a).

[8] See N.J.S.A. 2C:44-1(b).

reviewing court must ensure any aggravating or mitigating factors found by the trial judge under N.J.S.A. 2C:44-1 are based upon sufficient credible evidence in the record. State v. Miller, 205 N.J. 109, 127 (2011). If the factors found by the trial court are so grounded, the sentence must be affirmed, even if the reviewing court would have reached another result. State v. O'Donnell, 117 N.J. 210, 215 (1989). Under that deferential standard, only when the facts and law show "such a clear error of judgment that it shocks the judicial conscience" should a sentence be modified on appeal. State v. Roth, 95 N.J. 334, 364 (1984).

Whether a sentence will "gravitate toward the upper or lower end of the [statutory] range depends on a balancing of the relevant factors." State v. Case, 220 N.J. 49, 64 (2014). A court "must qualitatively assess" the factors it finds and assign each an "appropriate weight." Id. at 65. A "reasonable" approach for sentencing judges is to use "the middle of the sentencing range as a logical starting point for the balancing process." Natale, 184 N.J. at 488; see also State v. Fuentes, 217 N.J. 57, 73 (2014). "[I]f the aggravating and mitigating factors are in equipoise, the midpoint will be an appropriate sentence." Natale, 184 N.J. at 488. "[R]eason suggests that when the mitigating factors preponderate, sentences will tend toward the lower end of the range, and when the aggravating factors preponderate, sentences will tend toward the higher end of the range."

Ibid.  The sentencing court must explain its findings about each factor and how the factors were balanced to arrive at the sentence.  See R. 3:21-4(h); Case, 220 N.J. at 66; Torres, 246 N.J. at 272 ("The sentencing court's explanation of overall fairness provides a proper record for appellate review of the sentencing court's exercise of discretion.").

Because we are remanding for other reasons, as explained below, which will necessitate the court's revisiting the aggravating and mitigating factors, we briefly address the following issues.  The trial court should not consider defendant's 2008 juvenile deferred disposition regarding aggravating factors three, six, or nine unless permitted under State v. K.S., 220 N.J. 190 (2015).  The K.S. Court held, "when no such undisputed facts exist or findings are made, prior dismissed charges may not be considered for any purpose."  Id. at 199. The court should also not consider the current offenses when evaluating aggravating factor six.

2.  Consecutive Sentences.

Defendant further argues resentencing is required because the trial court "did not assess the overall fairness of the consecutive sentences and . . . wrongly believed that a consecutive term was required" for the bias intimidation conviction.

Regarding defendant's consecutive sentence under the bias intimidation statute, the trial court acknowledged although "the statute itself on its face does not specifically say that the sentences must run consecutive[ly] with regards to the bias intimidation, the language of the statute certainly does indicate that the [c]ourt should impose separate sentences" under N.J.S.A. 2C:16-1(e). The court indicated both the State and the defense were

> persuaded that the language of the bias intimidation statute, . . . N.J.S.A. 2C:16-1(e)[,] provides that the [c]ourt should, in fact, sentence . . . defendant to consecutive sentences when it imposes a sentence with regards to the bias intimidation, again, acknowledging . . . that the sentences imposed for a conviction on bias intimidation is to be a separate sentence, and also guided by the factors in [State v.]Yarbough[, 100 N.J. 627 (1985),] that provided that there can be no free crimes.

The court noted "the defense acknowledge[d] in their brief that the language in the [bias intimidation] statute certainly does implicate, if not expressly indicate[,] the intention that the sentences be run consecutively." On appeal, defendant now argues N.J.S.A. 2C:16-1(e) does not require consecutive terms. The trial court did not have an opportunity to address this new argument during the original sentencing, and we decline to consider the issue here for the first time on appeal. See State v. Witt, 223 N.J. 409, 418-19 (2015). Because we are remanding for resentencing, counsel may argue this point to the trial

104

court.

In <u>Yarbough</u>, our Supreme Court explained the following criteria must be considered "when [a] sentence is pronounced on one occasion on an offender who has engaged in a pattern of behavior constituting a series of separate offenses or committed multiple offenses in separate, unrelated episodes":

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>
>> (a) the crimes and their objectives were predominantly independent of each other;
>>
>> (b) the crimes involved separate acts of violence or threats of violence;
>>
>> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>>
>> (d) any of the crimes involved multiple victims;
>>
>> (e) the convictions for which the sentences are to be imposed are numerous.

A-2895-22

(4) there should be no double counting of aggravating factors;

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense; and

(6) there should be an overall outer limit on the cumulation of consecutive sentences for multiple offenses not to exceed the sum of the longest terms (including an extended term, if eligible) that could be imposed for the two most serious offenses.[9]

[100 N.J. at 643-44 (footnotes omitted).]

"[T]he five 'facts relating to the crimes' contained in Yarbough's third guideline should be applied qualitatively, not quantitatively."  State v. Carey, 168 N.J. 413, 427 (2001).  If a sentencing court fully evaluates the Yarbough factors, its decision will usually not be disturbed on appeal.  Miller, 205 N.J. at 129.  Importantly, "the sentencing court's explanation of its evaluation of the fairness of the overall sentence is 'a necessary feature in any Yarbough analysis.'"  Torres, 246 N.J. at 270 (quoting State v. Cuff, 239 N.J. 321, 352 (2019)).  Remand may be needed if a court does not sufficiently explain why consecutive sentences are warranted.  See Miller, 205 N.J. at 129; Carey, 168

---

9  "In 1993, the Legislature amended N.J.S.A. 2C:44-5(a) to clarify that '[t]here shall be no overall outer limit on the cumulation of consecutive sentences for multiple offenses.'"  Torres, 246 N.J. at 265 (citing L. 1993, c. 233, § 1).

N.J. at 424. A remand may be required when the trial judge omits this analysis, unless the reviewing court "can readily deduce" inclusion or omission of any factors. State v. Bieniek, 200 N.J. 601, 609 (2010).

We are unpersuaded the trial court satisfied the requirements set forth in Torres when addressing the overall fairness of imposing consecutive sentences. Again, when imposing a consecutive sentence, a sentencing judge is required to provide "[a]n explicit statement, explaining the overall fairness of a sentence imposed on a defendant for multiple offenses . . . ." Torres, 246 N.J. at 268. We conclude the court's sentencing did not sufficiently address the Torres analysis in imposing defendant's life sentence plus thirty-five years with a parole disqualifier. Accordingly, we are constrained to remand for resentencing to evaluate the overall fairness of the sentence guided by Torres.

3. Carlton/Erlinger Persistent Offender (not raised below).

Defendant further challenges his persistent offender enhanced sentence under N.J.S.A. 2C:44-3(a), arguing pursuant to Erlinger v. United States, 602 U.S. 821 (2024), his sentence violates his constitutional rights because it is based on judicial fact-finding.

The New Jersey persistent offender statute, N.J.S.A. 2C:44-3(a), provides a defendant may be sentenced to an extended term of imprisonment if the

individual "has been convicted of a crime of the first, second[,] or third degree and is a persistent offender." The statute defines a "persistent offender" as

> a person who at the time of the commission of the crime is [twenty-one] years of age or over, who has been previously convicted on at least two separate occasions of two crimes, committed at different times, when [they] w[ere] at least [eighteen] years of age, if the latest in time of these crimes or the date of the defendant's last release from confinement, whichever is later, is within [ten] years of the date of the crime for which the defendant is being sentenced.
>
> [N.J.S.A. 2C:44-3(a).]

In Erlinger, the United States Supreme Court held the Fifth and Sixth Amendments require a jury, not a sentencing judge, to find any fact that increases a sentence beyond the term authorized by the verdict. 602 U.S. at 833. It explained, except for determining the prior crime and its elements, a jury, not a sentencing judge, must find the necessary facts for sentencing enhancement. Id. at 834. According to Erlinger, "virtually 'any fact' that 'increase[s] the prescribed range of penalties to which a criminal defendant is exposed' must be resolved by a unanimous jury beyond a reasonable doubt (or freely admitted in a guilty plea)." Ibid. (alteration in original) (quoting Apprendi v. New Jersey,

A-2895-22

530 U.S. 466, 490 (2000)).[10]  The Court noted a trial court may need to bifurcate proceedings "by sequencing and separating the jury's determinations" to "address the prejudicial effect evidence about a defendant's past crimes can have on a jury."  Id. at 847-48.

We applied the constructs of Erlinger to New Jersey's persistent offender statute in State v. Carlton, 480 N.J. Super 311 (App. Div. 2024), rev'd, 262 N.J. 629 (2026).  There, the defendant appealed from his "convictions for aggravated sexual assault, sexual assault, aggravated assault, burglary, and criminal restraint against an Atlantic City casino-hotel housekeeper."  Id. at 315.  The trial court applied his two prior New York felony convictions as eligible predicate offenses and imposed a persistent offender extended term under N.J.S.A. 2C:44-3(a).  Id. at 316.  We determined Erlinger made clear "a jury— not a sentencing judge—must decide whether prior convictions used to establish the basis for enhanced sentencing had been committed on separate occasions." Ibid.  Given no evidence relevant to the defendant's persistent offender status

---

[10]  The Erlinger Court also acknowledged, "in many cases the occasions inquiry will be 'straightforward.'  Often, a defendant's past offenses will be different enough and separated by enough time and space that there is little question [they] committed them on separate occasions."  Id. at 842 (citation omitted) (internal quotation marks omitted).  However, ease of decision does not remove its resolution from the jury to the sentencing judge.  Ibid.

had been presented to the jury, this court found the trial court's sentence "amount[ed] to a complete and absolute denial of the [defendant's] right to a jury trial on the sentence-enhancement determination." Id. at 338-39. Accordingly, we held that "constitutional violation" could not be "disregarded" as plain or harmless error. Id. at. 336. Thus, we vacated the defendant's extended term sentence and remanded with instructions to correct the constitutional infirmity by permitting a jury to make the requisite findings. Id. at 355.

Our Supreme Court subsequently reversed on the "sole issue" of "whether an enhanced sentence under N.J.S.A. 2C:44-3(a) . . . predicated on fact-finding rendered without the benefit of a jury, could be subject to harmless error review." Carlton, 262 N.J. at 633. It ultimately held "such error is subject to harmless error review and was harmless under the circumstances of th[e] case." Id. at 633. The Court noted: "That is not to say that harmless error review will resolve every post-Erlinger claim. If, in contrast to this case, a judge makes the determination based on an ambiguous record, where, for example, the prior offenses were not indisputably committed at different times, harmless error review may be inappropriate."[11] Id. at 645.

---

[11] The Court further requested the Legislature to "examine the statute carefully at the earliest possible opportunity," reasoning:

As noted, we are remanding for the trial court to resentence defendant based on the misapplication of certain aggravating factors and its failure to address the overall fairness of the sentencing under Torres. On remand, the trial court shall be guided by our Supreme Court's decision in Carlton and consider the arguments of the parties on this issue.

To the extent we have not specifically addressed them, any remaining contentions raised by defendant lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed in part, vacated in part, and remanded for resentencing.

_____

> Continued use of the persistent offender statute as written could engender confusion for trial courts, prosecutors, and defense counsel, particularly when the immediate attention to Erlinger, and this case, has faded. If the persistent offender statute is not amended, a trial judge down the road may confront a persistent offender motion with new counsel on both sides and may turn to the statutory text but find no guidance consistent with Erlinger's requirements. In short, harmless error review is no perfect or permanent solution to the uncertainty created by a statutory scheme that no longer reflects controlling United States Supreme Court doctrine.
>
> [Id. at 646.]

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2895-22